[Civ. No. 3353. Third Appellate District.—February 29, 1928.]

MERCANTILE TRUST COMPANY (a Corporation), Respondent, v. SAN JOAQUIN AGRICULTURAL COR-PORATION, Appellant.

Everts, Ewing, Wild & Everts for Appellant.

Morrison, Dunne & Brobeck and Morrison, Hohfeld, Foerster, Shuman & Clark for Respondent.

HART, J.—The brief of the plaintiff briefly and correctly sets forth a general statement of the foundational facts as follows:

"On July 1, 1919, the San Joaquin Agricultural Corporation, made, executed and delivered to the Savings Union Bank and Trust Company, as Trustee, a mortgage to secure the payment of $500,000 par value of its bonds together with interest at 6% per annum. This mortgage covered certain real property in Madera County. The Savings Union Bank and Trust Company, the Trustee, accepted the trust; the San Joaquin Agricultural Corporation sold the entire issue of $500,000 of its bonds. On July 1, 1921, it defaulted in the preceding six months' interest, and when the complaint to foreclose the mortgage was filed on March 25, 1922, it had not paid any interest since January 1, 1921. The San Joaquin Agricultural Corporation also agreed that it would on July 1, 1921, pay the sum of $10,000 as a sinking fund for the retirement of its bonds. This it failed to do.

"After the execution and delivery of the mortgage, the Savings Union Bank and Trust Company, the Trustee named in the mortgage, and the Mercantile Trust Company of San Francisco, another bank located in San Francisco, consolidated under the name of Mercantile Trust Company. This consolidation took place under the provisions of the laws of the State of California expressly permitting it. Mercantile Trust Company, the consolidated institution claiming to be the successor trustee, brought the action to foreclose the mortgage. After a trial the court gave a judgment in favor of the plaintiff in the sum of five hundred seventy-two thousand fifty-eight and 11/100 dollars ($572,058.00), and decreed a sale of the property. The defendant failing to put up a bond, the property was sold."

There are three major points urged by the defendants for a reversal of the judgment. They are:

1. That the plaintiff is not, nor was it ever the successor of the Savings Union Bank and Trust Company, within the intent or contemplation of certain provisions of the mortgage or trust deed.

2. The principal debt not having matured at the time of the commencement of this action, the plaintiff was not entitled to recover the full amount of the principal and the

accumulated interest, but such interest only as had accrued thereon for the six months immediately preceding July 21, 1921, in the payment of which the defendant defaulted and was in default on the date just named.

3. That the defendant having failed to pay its corporate license tax for the year 1921, that by reason thereof it forfeited its right to do business, or, in other words, its corporate powers were thereby duly suspended; that thereupon it was without legal capacity to sue or to be sued or defend in any action at law or suit in equity; that the proper parties to proceed against in this suit under the law were the directors of the defendant, as trustees thereof.

The allegation of the complaint that the plaintiff came into existence by virtue of the consolidation of the Savings Union Bank and Trust Company, the original trustee under the trust herein involved, and the Mercantile Trust Company of San Francisco under the name of "Mercantile Trust Company" is not denied by the answer. The answer merely denies that the plaintiff "is now or ever has been a *successor* to said Savings Union Bank and Trust Company, as trustee or otherwise under the mortgage or deed of trust mentioned in paragraph 1 of said complaint," referring to the mortgage or trust deed to foreclose which is the object of the present action. It will be noted that the foregoing negative allegation does not, either expressly or by implication, deny that the two corporations mentioned in the complaint consolidated under the name of Mercantile Trust Company; nor, it may be further stated, is there elsewhere in the answer denial of such consolidation. The result is that it stands admitted in this case, as the complaint alleges, that the plaintiff "is a banking association duly created, organized and existing under and by virtue of the laws of the State of California, by the consolidation of Mercantile Trust Company of San Francisco and Savings Union Bank and Trust Company," the latter, as above stated, being the original trustee of the trust in question. But the claim that the plaintiff, upon such consolidation and by reason thereof, and by virtue of the provisions of the statute authorizing such consolidation, became the successor to said Savings Bank and Trust Company, as trustee under the mortgage or trust deed which is the subject of the controversy here, is, as will be perceived from the above quo-

tation from the answer, traversed by the defendant and thus an issue tendered thereon. This proposition, the first in the order in which we have hereinabove stated the several points upon the solution of which the decision herein depends, must be determined by the ascertainment of the true meaning of certain provisions of the deed of trust, viewed in and by the light of the law of this state under and by virtue of the provisions of which banking corporations are at liberty to consolidate.

1. The statute, self-designated and known as "The Bank Act" was amended in a variety of particulars by the legislature of 1913. (Stats. 1913, p. 136.) In that year, a new section was added to said act numbered and designated "Section 31a." (Id., p. 152 et seq.) At its legislative session in the year 1917, the legislature further amended certain sections of said act. (Stats. 1917, p. 598.) Among the sections then amended was said section 31a. It is that section which authorizes the consolidation of banking corporations, and in pursuance of the provisions of which the Savings Union Bank and Trust Company and the Mercantile Trust Company of San Francisco consolidated under the name of Mercantile Trust Company, which is the plaintiff in the present action. It is, therefore, with the provisions of section 31a that the present controversy is directly concerned. So much of said section as is necessary to be considered in the determination of the questions presented by this appeal reads as follows:

"Any bank incorporated under the laws of this state may consolidate with one or more banks incorporated under the laws of this state, its capital stock, properties, trusts, claims, demands, contracts, agreements, obligations, debts, liabilities and assets of every kind and description upon such terms and in such manner as may be agreed upon by their respective boards of directors . . . When the superintendent of banks issues the certificate of authorization provided for by section one hundred twenty-eight of this act the new or consolidated corporation shall be a body politic and corporate by the name stated in the certificate, and for the term of fifty years, unless it is, in the articles of incorporation and consolidation, otherwise stated and thereupon each constituent corporation named in the articles of incorporation and consolidation must be deemed and held to have

become extinct in all courts and places, *and said new corporation must be deemed and held in all courts and places to have succeeded to all their several capital stocks, properties, trusts, claims, demands, contracts, agreements, assets, choses and rights in action of every kind and description both at law and in equity, and to be entitled to possess, enjoy, and enforce the same and every thereof, as fully and completely as either and every of its constituents might have done had no consolidation taken place.* Said consolidated or new corporation must also, in all courts and places, be deemed and held to have become subrogated to its several constituents and each thereof, in respect to all their contracts and agreements with other parties, and all their debts, obligations, and liabilities, of every kind and nature, to any persons, corporations, or bodies politic, whomsoever, or whatsoever, and said new corporation must sue and be sued in its own name in any and every case in which any or either of its constituents might have sued or might have been sued at law or in equity had no such consolidation been made. Nothing in this section contained shall be construed to impair the obligation of any contract to which any of such constituents were parties at the date of such consolidation. All such contracts may be enforced by action or suit, as the case may be against the consolidated corporation, and satisfaction obtained out of the property which, at the date of the consolidation, belonged to the constituent which was a party to the contract in action or suit, as well as out of any other property belonging to the consolidated corporation, and the stockholders of each constituent corporation so entering into such agreement shall continue subject to all the liabilities, claims and demands existing against them at or before such consolidation to the same extent as if the same had not been made.'' (Italics ours.)

It is not claimed here, nor could it be, upon any sound or reasonable basis or hypothesis, that the legislation involved in the foregoing section of the Bank Act in any manner or degree impinges upon or transcends any of the constitutional restrictions by which the legislative department of the state is hedged. Nor can it be doubted that where, as here, there is, in pursuance of the provisions of section 31a of our Bank Act, a consolidation of two banking corporations the result of which is to bring into existence

a single corporation as the successor of the two, the former *ipso facto* succeeds to and is vested with ownership of the combined capital stocks, properties, trusts, contracts, etc., of the two several constituents of the corporation thus created, provided, of course, as to trust estates or other like contracts or agreements there is an absence of a stipulation or agreement between the parties to such contracts or agreements specifically prescribing a different devolution of such trusts, trust estates, mortgages, debts, etc., from that which otherwise would follow from the terms of said section. The rule as thus stated is declared and expressed in section 4712, volume 7, of Fletcher's Cyc. Corp., as follows:

"When corporations are consolidated, the rights, franchises and privileges of the consolidated corporation depend upon the intention of the legislature as manifested by the statute authorizing the consolidation. The legislature may confer upon it, with the consent of the consolidating corporations, which consent is given impliedly by entering into the consolidation, all the rights, franchises, privileges and property of the consolidating corporations, or it may withhold some of them, or it may add to them new rights, franchises or privileges. . . . If there is no provision to the contrary in the statute *or agreement between the parties,* the general rule, based upon the presumed intention of the legislature and the corporations, is that the consolidated corporation acquires by the consolidation all the rights, franchises, privileges and property of the consolidating corporations . . . Generally, there is an express provision to this effect in the statute authorizing consolidation, but it is not at all necessary. Such an intention on the part of the legislature will be presumed in the absence of provision to the contrary." (See, also, 5 Thompson on Corporations, secs. 6083, 6107, and 6111.)

The banking laws of the state of Illinois, as well as those of the State of New York, in all vital respects, are substantially the same as those of California. The provisions in the statutes of those states relating to the merging and consolidation of banking corporations are practically similar to those contained in section 31a of our own Bank Act. Especially illuminating and peculiarly pertinent to the present investigation, therefore, is the discussion in the decisions of the courts of those states in construing and expounding the

several provisions of their statutes relative to banking corporations and the scope and the effect thereof with respect to the rights acquired and the obligations assumed by the offspring of the consolidation of two or more banking corporations. The case of *Chicago Title & Trust Co.* v. *Zinser et al.*, 264 Ill. 31, 35 et seq. [Ann. Cas. 1915D, 931, 105 N. E. 718], is, in the facts, strikingly similar to the case at bar, and discusses and disposes of several points advanced here. In that case a corporation named Real Estate Title & Trust Company of Chicago was made by one Etta Nelson the executor of her last will and testament. By her will she authorized said corporation, as her executor, to sell and convey the real estate of which she died seised. At the time the will was made the Real Estate Title & Trust Company and the Chicago Title & Trust Company were two distinct and unrelated corporations, each organized under and according to the laws of the state of Illinois and each vested with the power and right to accept and execute trusts and to be appointed assignee or trustee by deed, and also to be appointed executor, guardian, and trustee by will. Subsequently to the making of the will, and prior to the death of Etta Nelson, the two corporations were consolidated into one, under the name of Chicago Title and Trust Company, in pursuance of the statute of said state authorizing such consolidation. After due legal proceedings, letters testamentary were issued to the plaintiff (the consolidated corporation), and thereafter said plaintiff instituted a suit to compel the specific performance by the Zinsers of an agreement, entered into by and between the latter and the plaintiff after letters testamentary had been issued to the corporation, whereby the Zinsers agreed to purchase certain real estate belonging to the estate of the deceased. The suit was resisted upon grounds involving objections similar to some of those urged against the position of the plaintiff in the case now before us. The cause reached the supreme court of Illinois, and the action was by that court sustained in an opinion so clearly and satisfactorily disposing of the objections referred to that we feel that pardonably we may *in extenso* quote therefrom as follows:

"By the consolidation of the Real Estate Title & Trust Company and the Chicago Title & Trust Company the original corporations ceased to exist, and the appellee, as the

consolidated corporation, acquired and succeeded to all the faculties, property, rights and franchises of its component parts and became subject to all the duties, obligations, and conditions imposed upon them. (*Robertson* v. *City of Rockford*, 21 Ill. 451; *Chicago, Rock Island & Pacific Railroad Co.* v. *Moffitt*, 75 Ill. 524.)

"The material question here is whether the general rule that a trustee cannot delegate his authority to another is an obstacle to the exercise of a power by the appellee to act as executor or trustee where one of the constituent corporations was named as such. That general rule rests upon the ground that the selection of a trustee implies personal confidence in his discretion and judgment. If a power is given to an executor or trustee which is not ministerial or given for the purpose of executing a declared trust which the court can enforce but which involves the exercise of discretion and judgment, the power cannot be delegated or transferred to another, either by the trustee or a court. The rule, however, cannot be applied to the case of a corporation, because the element of trust in the judgment and discretion of an individual is entirely wanting. A corporation is without personality, and if it is selected as trustee or executor there can be no reliance upon individual discretion or even upon the continuance of the same administration. Etta Nelson, in naming the Real Estate Title & Trust Company as executor and trustee, knew that its directors, officers, and stockholders might change from time to time, and that the statute authorized a change of name or place of business, enlargement, or change of the object for which the corporation was formed, an increase or decrease of capital stock or change in the number of shares or par value, increase or decrease of the number of directors, and the consolidation of the corporation with any other corporation then existing or that might thereafter be organized. She therefore contemplated that these changes might occur, and that the Real Estate Title & Trust Company might be consolidated with some other corporation such as the Chicago Title & Trust Company, and that it would thereby cease to exist and become a component part of a new corporation. A consolidation took place and a new corporation was created from the original corporations, with an enlarged capital stock and unimpaired

franchises. The appellee was entitled to execute the trust, and the chancellor did not err in overruling the demurrer."

To the same effect are the *Matter of the Will, etc., of Bergdorff*, 206 N. Y. 309 [99 N. E. 714]; *McElwain Co.* v. *Primavera*, 181 App. Div. 929 [168 N. Y. Supp. 1134]; see latter case also reported in 180 App. Div. 288 [167 N. Y. Supp. 815].

The soundness of the conclusions pronounced in the foregoing cases is not seriously disputed by counsel for the defendant. They do contend, however, that those cases have no application to the instant case for the reason that here the mortgage or trust deed itself specifically prescribes the method or means whereby a vacancy occurring for any reason in the office of trustee may be filled, and that the course thus pointed out for the filling of such vacancy is exclusive and must prevail and be followed, despite any legislation purporting by the force of its own terms to name or appoint a particular corporation as a successor to the retired trustee. The provisions of the trust deed referred to by counsel for defendant are embraced within article VI of the instrument, and are as follows:

"That the trustee or any successor of the trustee may at any time resign and discharge itself of the trust created by this indenture by written notice to the company given 30 days before such resignation shall take effect, or such other time as may be accepted by the Board of Directors of the company. The trustee may be removed at any time by an instrument or instruments in writing under the hands of the holders of a majority in amount of the bonds secured thereby then outstanding, such instrument or instruments to be filed with the trustee but no such removal shall be made without the consent of the company before default hereunder shall have occurred." (Sec. 3.)

"In case of dissolution of the trustee or his resignation or incapacity or removal as trustee hereunder, a successor (which shall be a trust company of good standing) may be appointed by the holders of a majority in amount of the bonds secured hereby then outstanding, by an instrument or concurrent instruments signed by said bondholders or their agents duly acknowledged; provided that if any vacancy in the trusteeship shall at any time occur, the company

may, by an instrument, executed pursuant to resolution of its Board of Directors, appoint a trustee to act, until a new trustee shall be appointed by the bondholders as aforesaid. Any succeeding trustee so appointed by the bondholders shall immediately and without further act, supersede any trustee appointed by the company." (Sec. 4.)

"Any new trustee shall execute, acknowledge and deliver to the trustee last in office and to the company, an instrument accepting such trust and thereupon such new trustee, without further act, deed or conveyance, shall become vested with all the assets, property, rights, powers, trusts, duties and obligations hereby created as if originally named as trustee herein but the trustee ceasing to act shall nevertheless, upon demand, execute and deliver to the new trustee, a written assignment of said trust and mortgaged property, suitable and proper to be recorded, and shall duly pay, transfer and deliver all personal property and money held by it hereunder, to such new trustee." (Sec. 5.)

The argument of the defendant is that the foregoing sections of the deed of trust must be construed together, and that as so construed it rationally follows that the intent of the instrument is that, in case of a vacancy for any reason in the office of trustee, the matter of filling such vacancy shall rest entirely with the holders of the bonds, or, concretely speaking, with the holders of a majority in amount of the bonds then outstanding.

Section 3, it will be noted, merely prescribes the manner in which the resignation or the removal of the trustee may be effected. Without such a provision the trustee could resign or relinquish all interest it has in the trust estate, and could, upon the happening of circumstances justifying it, be removed at the instigation of the parties owning the beneficial interest therein or such interested parties as might be deemed the proper ones to proceed in such case. It might, and perhaps would, in the absence of such a provision as is embodied in section 3, be necessary to invoke the aid of an equity court to supply the vacancy, and it may be assumed that this very consideration is what led to the insertion in the deed of section 3, whereby the procedure for the appointment of a successor to the trustee, in case of its resignation or removal, is specifically prescribed. Such a

provision in a deed of trust or a testamentary trust is not unusual. Indeed, it would be strange if some such provision were not inserted in a trust deed or a will creating a testamentary trust, so that the purpose or purposes of the trust may not fail of full or proper accomplishment by reason of contingencies arising in the course of the administration of the trust which are in the very nature of things in such cases to be anticipated or must be expected may happen. It is perfectly clear that the power thus conferred upon the bondholders to fill a vacancy occurring in the office of trustee is not only necessary to the preservation of the trust and the objects thereof, but is in no way or sense inconsistent with the scheme provided for by section 31a of the Statute of 1917, *supra*, in the case of a consolidation of two or more banking corporations into a single corporate entity, whereby the latter becomes the successor in interest to all the properties, contracts, trusts, obligations, corporate rights, etc., which may have been owned or controlled by the constituent corporations. The right of the bondholders to fill any vacancy occurring in the trusteeship of the trust continued and still remains unimpaired, notwithstanding the consolidation. They may exercise that right whenever there may arise any of the contingencies specified in section 3 of article VI of the deed of trust after as well as before the consummation of the act of consolidation. ■ But it is insisted by counsel that the effect of the consolidation of the trustee named in the deed of trust with the Mercantile Trust Company of San Francisco was to dissolve the Savings Union Bank and Trust Company (trustee), and, therefore, under the terms of section 4 of article VI of the trust deed, it became the duty and the exclusive right of the bondholders to appoint a successor to the alleged defunct trustee, except that the board of directors of the defendant may, if the exigencies of the situation require it, appoint a trustee to act *ad interim,* or until the bondholders have themselves appointed "a new trustee." Section 4 of article VI is hereinabove reproduced, and it will be observed that it provides that "in case of dissolution of the trustee or his resignation or incapacity or removal as trustee hereunder, a successor (which shall be a trust company of good standing) may be appointed by the holders of a majority in amount of the

bonds secured hereby then outstanding," etc. The Savings Union Bank and Trust Company was not "dissolved" by the act of consolidation in the strict legal sense of that term, nor, in our opinion, in the sense in which it is used and was intended to be used in section 4 of article VI of the deed. The Bank Act does not expressly so declare. It is, as seen, therein declared .(sec. 31a) that "when the Superintendent of Banks issues a certificate of authorization provided by section 128 of this act, the new or consolidated corporation shall be a body politic and corporate by the name stated in the certificate and thereupon each constituent corporation named in the articles of incorporation and consolidation must be deemed and held to have become extinct in all courts and places," etc. It is true that each of the consolidated banking corporations, as a distinct, independent, and separate corporate entity, practically passes out of existence or becomes extinct upon the completion of the act of consolidation. But, unlike in cases of dissolution, their corporate activities do not cease but are continued and are prosecuted and carried on through a new channel—a channel created solely by their own voluntary act under the sanction of the law for that specific purpose. Speaking figuratively, the act of consolidation is merely the joint transfusing of the blood of the constituent corporations into the veins and arteries of a new single corporate entity, that they may enlarge and extend the scope and business ramifications of their own corporate purposes and also to impart enhanced solidity to their responsibility as banking and trust corporations. But regardless of these considerations, the natural and, therefore, the more reasonable conclusion is that section 4 of article VI of the instrument, in so far as is concerned the authority therein vested in the bondholders to appoint "a new trustee" upon the "dissolution" of the trustee named in the deed, was intended to refer to the "dissolution" of the corporation by and through the procedure laid down in sections 1227 to 1235, inclusive, of the Code of Civil Procedure. Section 1227 provides: "A corporation may be dissolved by the superior court of the county where its principal place of business is situated, upon its voluntary application for that purpose."

■ The sections immediately following prescribe the procedure for bringing the matter of dissolution before the court. Corporations are solely creatures of the legislature. They may exist or, after brought into being, voluntarily cease to exist by virtue of statutory enactments, expressly authorized, it is true, by the constitution (art. II, sec. 1).

■ In prescribing the procedure for effecting a dissolution, the legislature has established a legal definition of the word "dissolution" as applied to the proceeding for completely and definitively terminating the existence of corporations. The proceeding to dissolve is not connected or conversant with consolidation or merger. The dissolved corporation leaves no successor, for it has none to leave. Since, therefore, the statute itself provides a legal definition of "dissolution" as the means for putting out of existence a corporation, the presumption is, there being nothing in the deed of trust to indicate a contrary meaning or intention, that the word "dissolution" as well as the word "incapacity" as used in section 3 of article VI, were intended to refer to the "dissolution" of a corporation which is expressly authorized by the sections of the Code of Civil Procedure above named. And, obviously, there was not a resignation of the trustee, nor, clearly, was there effected a removal of that officer by or through the act of consolidation, within the meaning of the word "removal" in its commonly understood and accepted signification, in which sense it was clearly used, to wit, a removal for mismanagement by the trustee of the affairs of the trust or any neglect in the discharge of its duties as trustee detrimental to those having a beneficial or other vital interest in the trust agreement. Neither from the connection in which the word is employed in said section of the trust deed nor from any considerations otherwise arising from the instrument when viewed in its entirety is there apparent any just reason for ascribing to the word as it is so used any other than its colloquial meaning.

Section 5 of article VI of the deed of trust or mortgage merely points out the course to be pursued where the trustee has resigned or been removed and the bondholders exercising the right given them by section 3 of article VI of the deed to fill the vacancy, have appointed a successor or a new

trustee. The provisions of said section in no way conflict with the conclusion that there is no inconsistency between the scheme provided by section 31a of the statute for the consolidation of banking corporations or the consequences flowing from such consolidation and the right conferred upon the bondholders by said section of the trust deed or mortgage to fill any vacancy that may occur by reason of the happening of any of the conditions specified in said section.

Much is said in the briefs upon the proposition (urged by the defendant and combatted by the plaintiff) that the authority vested in the bondholders by said section to appoint a trustee in the event of a vacancy in the trusteeship is exclusive—that is, that no such authority rests anywhere else. Counsel for the plaintiff argue that the language of said section 3 is permissive only, and in support of the argument cite the fact that the auxiliary verb "may" is used in conferring the authority upon the bondholders to appoint a trustee in the case of a vacancy and that if it had been intended by the parties to the instrument that the power to appoint was exclusively to rest in and be exercised by the bondholders the mandatory word "must" or "shall" would have been used in the place of the verb "may." We have previously herein stated that the right of the bondholders to appoint under the provisions of the section named of the mortgage or trust deed has not been taken from them by the fact of the consolidation. As likewise, in effect stated, it would be the duty of the bondholders, so far as a permanent appointment is concerned, to make the appointment upon the happening of a vacancy under any of the circumstances specified in said section, and that if they failed or refused to do so, they could be compelled by a court of equity to perform that duty, or such court, upon a properly presented and sufficient showing, could itself fill the vacancy. These propositions, it seems to us, are unassailable. But by the act of consolidation under the law authorizing the consolidation or merger of banking corporations a trustee was in effect named or appointed to take the place of the trustee becoming extinct simultaneously with the consummation of the act of consolidation, or, in other language, the law itself designated who should succeed to the trusteeship

in case of the consolidation of the trustee bank with another banking corporation, and the trustee so designated was competent to act and was legally acting as such at the time of the commencement of this action. And the trustee so designated will remain such trustee until its dissolution by or through the procedure established by the legislature, or its resignation or removal happens, when (and only when) the bondholders may put into action their right under section 3 of article VI of the mortgage or deed of trust to appoint a successor to the dissolved or retired trustee.

■ That there can be conceived no just objection on constitutional grounds to the statute is a proposition supported not alone by the authorities, of which some are hereinabove cited, but upon principle or the reason which is its foundational sponsor. The statute involves only the exercise of the power of the legislature, from which alone corporations derive their right to exist and carry on business, to subject those organizations to such regulatory control as may be deemed or found by the law-making power to be necessary to the proper functioning thereof in accord with their corporate scope and purposes and also to the correction of corporate abuses, if such occur. So long as the legislature, in exercising its right to regulate the manner in which corporations may carry out their purposes, does not impose upon them unreasonable burdens, obligations, or restrictions, or does not, in regulating them, unfairly discriminate as between corporations of the same general class, such organizations must submit to and abide by all the conditions upon which they are authorized to prosecute the objects for which they were created.

■ Much of what has been said above involves an answer to the suggestion that the effect of the application of the provisions of section 31a of the statute is to impair the obligation of contracts, contrary to the imperative inhibitions against legislation having such effect of both the federal and state constitutions. It is obvious that the terms of the trust deed or mortgage are in no sense or measure changed, nor are the obligations of the instrument as they are written therein impaired or any the less enforceable by reason of the act of consolidation. The changing of the trustee as a result of the consolidation, as has been stated and as is

obvious, is the act of the law authorizing the consolidation. ▆ All corporations, as has also been stated, are organized with full knowledge by the people of all the laws governing the formation of corporations and the exercise of their rights and obligations thereunder, and, therefore, in such an instance as we have here, the statute authorizing the consolidation or merger of banking corporations, in so far as it prescribes a scheme for the transfer of their properties, rights, agreements, obligations, duties, etc., to the consolidated corporation, enters into and becomes a part of every agreement or obligation entered into or assumed by the constituent corporations prior to the consolidation, and of this the defendant, its directors and bondholders are presumed to have known before and at the time of the execution of the trust deed. Indeed, in appointing the Savings Union Bank and Trust Company the trustee of the trust, the defendant and its officers and the holders of the bonds secured by said deed to or mortgage upon the lands therein described are to be held to have impliedly assented to the exercise of the legal right of said bank to merge into or consolidate with another banking corporation, with all the consequences following such merger or consolidation as are prescribed by the law. At all events, the consolidation having been effected under and by virtue of express authority of law, the contracts of third parties with either of the constituent corporations cannot be violated by the consolidated corporation, but will be enforced according to the strict letter of their terms as fully and effectually as they would be by the constituent corporations had there been no consolidation. As to all the propositions which we have just been considering, the following from *McElwain Co.* v. *Primavera*, 180 App. Div. 288 [167 N. Y. Supp. 815], is singularly enlightening:

" 'Dealing with the original banking corporation, the defendant subjected himself to the possibility of merger and the enforcement of the contract by the new corporation, which is new, so far as the defendant is concerned, in name only.' (*Bank of Long Island* v. *Young*, 101 App. Div. 88 [91 N. Y. Supp. 849].)

"The provisions of section 37 of the banking law quoted above, regulating the transfer and the vesting of property in a case where merger occurs, are very broad. The legislature

did not contemplate that the property of one bank merged in another should vest in the corporation in which the merger takes place by operation of any assignment, or that such transfer should be attended with the usual rules of law in respect to assignments. The scheme is that the corporation which is merged with another, should lose its identity only so far as its separate existence is concerned, and that it should be swallowed up in the other, and become an integral part thereof, carrying into the corporation which survived all its rights, powers, liabilities, and assets, except the *indicia* and attributes of a corporate body distinct from that into which it is merged.''

2. The question presented under this assignment is, as seen, whether the plaintiff was entitled, under the provisions of the mortgage or trust deed to a decree for the entire amount of the principal as well as for the interest falling due and becoming payable under the terms of the instrument. The complaint alleges and the answer admits that the interest on certain bonds secured by the mortgage became due and was payable on the first day of July, 1921, and like interest became due and payable on the first day of January, 1922; that the defendant defaulted in the payment of such interest. It is further alleged in the complaint and expressly admitted by the answer that the defendant failed to create, as provided in the mortgage, a sinking fund to be applied to the purchase, redemption, and payment of the matured bonds secured by the instrument, and failed, therefore, to pay plaintiff the sum of $10,000 due and payable out of said fund on the first day of July, 1921, as stipulated in the mortgage or trust deed. While it is admitted that the plaintiff was entitled to these payments and was at liberty, under the provisions of the mortgage, to proceed to the enforcement thereof, the right of the plaintiff to a decree also for the full amount of the principal is denied. This position is predicated upon the proposition that the plaintiff failed or omitted, prior to the bringing of this action, to comply with the provisions of the mortgage requiring it, as a prerequisite (as is the claim) to the exercise of the right to invoke any of the several remedies provided by the instrument for the enforcement of the payment of any moneys falling due and becoming payable under the mort-

gage, to give the defendant notice in writing of its default in the payment thereof, and like notice of its election to declare the whole principal sum due and payable by reason of such default—that is, notice of the acceleration of the maturity of the bonds because of the default in the payment of interest due, and also in failing to create the sinking fund for the redemption or purchase of matured bonds and out of said fund paying to plaintiff the sum of $10,000 on the date mentioned in the complaint, as hereinabove indicated.

The complaint alleges that the notices referred to were duly served upon the defendant. The answer denies the allegation. Upon the proof submitted upon that issue, the court found that the notices had been given to or served upon the defendant in manner and form as prescribed by the mortgage, with this exception: That, while the mortgage expressly provides that the notices shall be delivered to the president or secretary of the defendant, or sent to it by registered mail at the city of San Francisco, the notices were not so sent at the city named, but purported to have been sent to the defendant by registered mail at "Fairmead." It is contended that the finding is not supported for the reason that the notices were neither delivered to the president or secretary of defendant nor sent "by registered mail to it at San Francisco," and for the further reason that it was not properly or sufficiently shown that they were sent by registered mail to defendant at "Fairmead."

The vice-president of the plaintiff, R. W. Sims, testified that the notices required by the mortgage to be delivered or sent to defendant by plaintiff upon default by the former in making payments required were prepared by certain employees of the plaintiff under his (Sims') directions; that they were signed by him as such vice-president and also by the secretary of plaintiff, and, with a letter explaining their nature and purpose, were delivered to an employee of the plaintiff to be registered and then deposited in the mail; that they were addressed to defendant at Fairmead, a post-office on or near the lands covered by the mortgage, and registered receipts returned acknowledging the receipt of the documents as they were designated by the postoffice register number. Sims stated that he knew "from the ordinary

procedure'' of the business of the corporation that the letters and notices were sent in the name of the defendant to Fairmead. These letters and notices over objection by the defendant were admittted in evidence. It also appeared that the defendant maintained offices on the lands under mortgage and that one Casterson was the superintendent of the ranch and that he signed one of the registered receipts and that another was signed by one P. L. Billman. These signatures were over a printed line in the notice as follows: ''Signature of addressee's agent.'' Whether this testimony was sufficient to make out a legal *prima facie* showing that the notices, etc., were properly or legally delivered or sent to the defendant is a question which counsel for the respondent do not argue in reply to the contention of the defendant that the showing is wholly insufficient for the purpose. It is, however, the contention of the plaintiff that under the provisions of the mortgage where there is default in the payment of interest and such default has continued for a period of sixty days a notice to defendant of such default is not necessary to justify it in proceeding to enforce the payment of such interest by any of the several remedies pointed out in the mortgage; that this is not only true, but that the plaintiff may also without any notice declaring the full amount of the bonded indebtedness due and payable before maturity institute proceedings in court for the purpose of foreclosing on the principal as well as on the interest. This will necessitate a construction of the provisions of the mortgage regarding defaults and the steps which may be taken and the scope thereof to enforce the payment of interest due and payable and in the payment of which the defendant is in default.

Section 1 of article V of the mortgage provides:

''If one or more of the following events, hereinafter called events of default shall happen, that is to say, If:

'' (a) Default shall be made in the payment of the principal of any of the bonds hereby secured; or

'' (b) Default be made in the payment of any interest of any of said bonds and such default in payment shall have continued for the period of sixty (60) days; or

'' (c) An order shall be made and kept in force for thirty (30) days for the appointment of a receiver of the Com-

pany or of any of the property hereby mortgaged or for the winding up or liquidation of the affairs of the Company, or corporate action shall be taken by the Company for any of said purposes; or

"(d) Default shall be made in any payment required by or in the due performance or observance of any covenant, promise or condition on the part of the Company, its successors or assigns, in the said bonds or in this indenture contained, and such default shall continue for sixty (60) days after written notice to the Company from the Trustee specifying such default and requiring same to be remedied."

Then follow provisions prescribing any one of several acts to which the mortgagee may resort for the enforcement of the payment of any money due under any of the defaults above enumerated. These provisions will be hereinafter considered. Section 5 of article V, among other things, provides as follows:

"Section 5: If any one or more of the events of default shall happen the Trustee with or without entry, personally or by its attorney, may and upon written request of the holders of twenty-five (25) per cent., or more, in amount of the bonds issued hereunder then outstanding, shall either:

"(a) Sell at public auction to the highest and best bidder, all and singular the mortgaged property and premises, rights, franchises, interests and appurtenances, and all other real and personal property of every kind, including shares of stock, securities, contracts, leases, franchises and all rights, title and interest, claim and demand therein and right of redemption thereof; or

"(b) Proceed to protect and enforce its right or rights of the bondholders under this indenture by a suit or suits in equity or action of law, either for the specific performance of any covenant or agreement contained herein, or in aid of the execution of any power herein granted, or for the foreclosure of this indenture, or for the enforcement of any other appropriate legal remedy as the Trustee shall deem most effectual to enforce or protect any of its rights or duties hereunder."

Section 13 of said article provides how the "money, proceeds and avails of any such sales hereunder" shall be applied. These include the payments of costs, expenses of sale,

compensation to the trustee, agents and attorneys, and "all expenses, liabilities, advances made or incurred by the trustee and to the payment of all taxes, assessments or lien prior to the lien of these presents, except any taxes, assessments or other superior lien subject to which such sales have been made." The second subdivision of said section then provides:

"To the payment of the whole amount of principal and accrued interest of the bonds hereby secured, with interest on the overdue installments of interest at the same rate, and in case such proceeds shall be insufficient so to pay in full the whole amount of said bonds, then to the payment of such principal and interest without preference or priority of principal over interest or of interest over principal, or of any installment of interest over any other installment of interest, ratably according to the aggregate of such principal, and accrued interest; subject, however, to the provisions of section 2 of article II of this indenture."

The specific contention of the defendant that written notice must be given it of the happening of any of the "events of default" before the right of action on such default shall accrue to the plaintiff is grounded on the language of subdivision "d" of section 1 of article V and that of section 4 of said article. It will be observed that the language of subdivision "d" of said section provides that if "default shall be made in any payment required by or in the due performance or observance of any covenant, promise or condition on the part of the company . . . in the said bonds or in this indenture contained, and such default shall continue for sixty days *after written notice to the company from the Trustee specifying such default and requiring same to be remedied,*" etc., then, stating it as it is correctly stated in respondent's brief:

"(1) It could enter upon the mortgaged property, take possession thereof, exclude the owner therefrom, and collect all the income, and it could apply this income, first to the costs of operation of the property, and next 'to the payment of the principal of all bonds hereby secured and then payable.'

"(2) It could declare the principal of all of the bonds to be due.

"(3) It could proceed to foreclose the bond issue."

Section 4 of article V provides:

"If one or more of the events of default shall happen, the Trustee may, and upon the written request of the holders of twenty-five (25) per cent., or more, in amount of the bonds hereby secured and then outstanding, shall by notice in writing delivered to the president or secretary of the Company or sent to it by registered mail at the said City and County of San Francisco, declare the principal of all bonds hereby secured and then outstanding to be due and payable immediately. This provision, however, is subject to the condition that if at any time after the principal of said bonds shall have been so declared due and payable before maturity, all matured interest and principal of such bonds, with interest on overdue interest at the same rate, and expenses and compensation of the Trustee or of any receiver, and all other payments which may be due from the company under this indenture, either shall be paid by the Company or be collected out of the mortgaged premises before any sale of the mortgaged premises shall have been made, . . . "

The mortgage has given to the trustee several different remedies, independent of each other and cumulative, whereby the rights of the bondholders may be protected or enforced; and section 7 of article V expressly declares that:

"Every remedy in this indenture provided shall be cumulative, and shall be in addition to every other remedy given hereunder, or now or hereafter existing at law or in equity or by statute, and every power or remedy given by this indenture to the Trustee or to the bondholders may be exercised from time to time and as often as may be deemed expedient. No delay or omission of the Trustee or of any bondholder to exercise any right or power arising from any default shall be construed to be a waiver of any such default or an acquiescence therein."

It will be observed that section 1 of article V expressly declares that failure by the defendant to do any one of four things specified separately in as many subdivisions thereof will constitute "an event of default," upon which the trustee may proceed in any of the ways prescribed by the three succeeding sections of article V, to enforce its rights and those of the bondholders. It will also be noted that each

of the three subdivisions following subdivision "a" is immediately preceded by the disjunctive "or," so that said subdivisions must be read as follows: If (subd. "a") default shall be made in the payment of the principal of any bonds hereby secured"; *or* (subd. "b") if "default be made in the payment of any interest of any said bonds and such default in payment shall have continued for the period of sixty days"; *or* (subd. "c") if "an order shall be made and kept in force for thirty days for the appointment of a receiver of the Company . . . "; *or* (subd. "d") if default shall be made in any payment required by or in the due performance or observance of any covenant, promise or condition on the part of the Company, . . . "then the plaintiff was at liberty to proceed to enforce the rights of itself and the bondholders in any of the several ways pointed out above. It follows from this alternative form in which the several events of default are stated or defined that each event was intended to be wholly independent of and disconnected from any of the others. To be somewhat more explicit, the alternative form of setting forth the several events of default clearly indicates that the happening of any one of the defaults should be sufficient of itself and without reference to the conditions involved in any of the other defaults, to entitle the trustee to proceed in any of the several ways prescribed by said section 1 and by the three succeeding sections of article V to enforce the rights of the bondholders and itself. Therefore, since subdivision "b" of said section 1 does not itself require that written notice be given by the trustee to defendant of its default in the payment of interest which is due and payable before the right to proceed to enforce the payment of such interest in any of the several ways indicated in said section 1 and the three succeeding sections of article V has ripened or accrued, it must be held that none is required and that it was not intended that such notice should be required.

The language of both sections 1 and 5 of article V is too plain to encourage serious contention that the happening of any one of the events of default mentioned in the first section of said article is not sufficient to authorize the trustee to invoke any of the several remedies expressly made available to the trustee for the enforcement of the right infringed

by such default. In other words, as counsel for the plaintiff states in their brief, the trustee's authority thus to proceed may be exercised where but one of the events of default has happened. Indeed, section 5 of article V expressly so declares. Under said section, as will be noted, where "any one or more of the events of default shall happen," the trustee may itself, in the exercise of its discretion, either sell at public auction all the mortgaged property and premises, rights, franchises, etc., or "proceed to protect and enforce its right or the rights of the bondholders under this indenture" by foreclosure "of this indenture," unless written request is made of the trustee so to proceed by the holders of twenty-five per cent or more, in amount of the bonds issued under the mortgage outstanding, in which event it then becomes the mandatory duty of the trustee to proceed to sell or foreclose, as indicated. Reinforcing the construction that on the happening of any one or more of the events of default the trustee may foreclose the mortgage without previously declaring the principal debt due and payable is section 13 of article V, providing that "the money, proceeds and avails of any such sale hereunder, whether under the power of sale hereby granted or pursuant to judicial proceedings, . . . shall be applied as follows: First, to the payment of the costs and expenses of such sale, . . . "; second, "to the payment of the *whole amount* of the principal and accrued interest of the bonds hereby secured . . . "

Again, section 6 of article V provides:

"In case of a sale of any of the mortgaged and pledged property, whether under power of sale hereby granted, or under judicial proceedings, the whole of the principal sum of the outstanding bonds shall immediately become due and payable, anything in said bonds or in this indenture to the contrary notwithstanding."

The language of the foregoing section cannot be construed to mean anything other than that when a sale takes place in pursuance of proceedings in foreclosure the entire principal sum of the mortgage immediately becomes due, thus clearly negativing the proposition, above declared, that it was intended to be necessary that the trustee should declare the entire principal due, or, in other words, by declaration ac-

celerate the maturity of the bonds before action can be brought to foreclose the mortgage.

Viewing by the light of each other, as we have above considered them, all the provisions of the mortgage to which special attention has been given, it is clear that the trustee was at liberty to exercise its specially given right to proceed with the foreclosure of the instrument for the full amount of principal and interest upon the default in the payment of interest without giving to the defendant notice of the default in the payment of interest (for two interest periods, as the complaint alleges and the evidence shows) or notice declaring the whole of the principal due by reason of the defaults mentioned.

That the language of subdivision "b" of section 5 (article V) and that of the second subdivision of section 13 (same article) clearly indicate that, upon the happening of any one or more of the events of default described in section 1 of said article, the plaintiff trustee might sue in foreclosure for the whole amount of principal and interest is a proposition which affords no legitimate ground for controversy. The provision of subdivision "b" is that upon any of such defaults the trustee may, among other things, maintain a suit "for the *foreclosure of this indenture*"—that is, of course, for "the foreclosure of this mortgage." The language of section 13 is in this respect equally clear. It provides, as will be seen, that "the money, proceeds and avails of any such sale hereunder, whether under the power of sale hereby granted or *pursuant to judicial proceedings*," are to be applied, after first paying compensation to the trustee, etc., expenses, etc., "to the payment of the *whole amount of principal* and accrued interest of the bonds hereby secured." As counsel for the plaintiff well suggest, the language referred to "can mean one thing, and one thing only, and that is that the full amount of the mortgage became due by the terms of the mortgage upon the filing of the foreclosure suit, and no notice declaring it due was necessary."

The right of the trustee in this case to foreclose for the full amount of the principal upon default in the payment of interest is given in language no less explicit than that held to confer a similar right in the case of *Brickell* v.

*Batchelder*, 62 Cal. 623, and in other cases following and approving the reasoning and the result reached in that case. There the mortgage was to secure the payment of a promissory note for $36,000. The note provided that the interest should be payable monthly, and all arrearages in interest should be added monthly to the principal and bear interest at the same rate. The mortgage, however, provided that in case of default in the payment of the principal sum or the interest thereon, the trustee had the right to proceed to sell the mortgaged premises before the maturity of the principal "in the manner prescribed by law," and "out of the money proceeding from such sale, the party of the second part (mortgagee) shall *retain* the above amount of $36,000.00, with interest," etc. The contention in that case was that the note itself measured in full and limited the rights of the plaintiff in case of default in the payment of interest only in the provision that such interest should be added to the principal and bear like interest; that the provision of the mortgage that in the event of such default the mortgagee might proceed to sell the mortgaged property "in the manner prescribed by law" was not reasonably susceptible to the construction that thus the mortgagee was empowered to proceed to foreclose the mortgage. The court denied the validity of both contentions, saying, among other things:

"In regard to the note and mortgage of June 1, 1874, we are of opinion that, taking the terms of the note and the stipulation above quoted from the mortgage, the plaintiff had the right, on default in the monthly payment of the interest, to commence an action to foreclose. The interest by the terms of the note, was payable monthly, and there was a default in its payment, so alleged and not denied.

"It would be difficult to detect any difference between a stipulation empowering a mortgagee to proceed to foreclosure on such default, and one giving authority on like default 'to proceed to sell' 'in the manner prescribed by law.' The law prescribes but one mode of sale in the case of mortgaged property, and that is at public outcry, by virtue of an execution issued on a judgment of foreclosure. (Code Civ. Proc., secs. 684, 726, 744.) The power given in the mortgage by the clause just above quoted is to proceed to sell in the manner prescribed by law—which, in our judg-

ment, is in substance the same as a power to proceed to sell by means of an action to foreclose. The power to sell in the manner prescribed by law being given, all means given by law to render such power effectual are also conferred; that is, all means necessary to effectuate a sale in the mode established by law are given. The power to use the lawful means necessary and proper to carry out the express power is conferred and given by an implication as strong and clear as if it was expressed in so many words. (Civ. Code, sec. 1656.) This is a familiar and well-established rule in the construction of powers. (See Story on Agency, secs. 55, 56, 58, 59, 60, 73; Wharton on Agency, sec. 187.)''

Again, speaking of the contention as to the provision in the note regarding default in the payment of interest, the court said:

''But it is urged that the proper interpretation of the language of the note shows that such remedy was not to be allowed to plaintiff; that his only right, if the interest was not paid every month, was to add it to the principal and to have interest on it at the rate which the principal bore. To admit the soundness of this position would be to lay out of view the terms of the note, which binds the makers to pay the interest monthly. It would be to discard and reject the rule which requires one in looking for the true meaning of an instrument to accord to every word its just and proper meaning. (Civ. Code, secs. 1639–1641; Broom's Legal Maxims, 555—*Exantecedentibus, etc.*)''

In *Maddox* v. *Wyman*, 92 Cal. 674 [28 Pac. 838], the action was to foreclose a chattel mortgage given to secure the payment of a note for $2,400, payable in monthly installments of $50, together with interest. The mortgage provided that in case of default in any payment, then the mortgagee ''may take possession of the property . . . and may immediately proceed to sell the same *in the manner provided by law,* and from the proceeds pay the whole amount of said note.'' The defendant contended that the plaintiff was entitled to sell only so much of the property as was necessary to pay the two installments in the payment of which there was default, as provided by section 728 of the Code of Civil Procedure. The court held that the plaintiff

was entitled to foreclose for the full amount of the unpaid installments, citing *Brickell* v. *Batchelder, supra; Leonard* v. *Tyler,* 60 Cal. 299; *Beal* v. *Stevens,* 72 Cal. 451 [14 Pac. 186]. It was further held in that case that to put the defendant in default, it was not necessary that ''demand should be made for such payment before the commencement of the action.''

In *Phelps* v. *Mayers,* 126 Cal. 549 [58 Pac. 1048], the defendant had given plaintiff a mortgage on certain land to secure the payment of a note for $1,500. There was no provision in the note that the whole of the principal should become due in case of a default in the payment of interest. The mortgage, though, contained the following provision:

''But in case default be made in the payment of the said principal or interest as herein provided, then 'the mortgagee is' hereby empowered to sell the said premises . . . or any part thereof, in the manner prescribed by law, and out of the money arising from such sale to retain the said principal and interest, together with the costs and charges . . . of suit for foreclosure, including counsel fees at the rate of fifteen per cent upon the amount which may be found to be due.''

The action for the foreclosure of the mortgage was commenced some six months before the maturity of the principal, and the defense that the action was prematurely brought was interposed, supported mainly by the argument that neither the note nor the mortgage provided that the principal debt should become due on default in payment of interest. The court said:

''The note and mortgage, however, must be construed together; interest on the note is payable semi-annually, and the mortgage is clear that upon default in the payment of the interest, equally with default in the payment of the principal, the mortgagee may cause the premises to be sold and retain from the proceeds 'the said principal and the interest'; there is scarcely room for interpretation in these provisions; they support the action for the amount of the note, both principal and accrued interest. (*Brickell* v. *Batchelder,* 62 Cal. 623; *Maddox* v. *Wyman,* 92 Cal. 674 [28 Pac. 838].)'' (See, also, *Hall* v. *Jamesson,* 151 Cal. 606, 614 [121 Am. St. Rep. 137, 12 L. R. A. (N. S.) 1190, 91 Pac. 518].)

The doctrine of *Brickell* v. *Batchelder* has been approved in other jurisdictions. In *Hooper* v. *Stump*, 2 Ariz. 262 [14 Pac. 799], the mortgage provided that upon default in the payment of principal or interest, "as provided," the mortgagee was empowered to sell the mortgaged premises, even though the note be not due, "in the manner prescribed by law, and, out of the moneys arising from such sale, to *retain* the said principal and interest. . . . " The action was begun before the note matured. The trial court awarded plaintiff a decree of foreclosure, which was affirmed by the supreme court. It was said in the opinion, citing *Brickell* v. *Batchelder, supra:*

"The language is plain and can mean nothing else than, on failure to pay the principal or interest, power is given to sell the premises and retain such principal and interest. If it were only to cover interest in default of payment of interest, why say to *retain* the principal? Such is the contract, and by it the parties must stand." (See, also, *Copper Bell Min. Co. et al.* v. *Costello*, 12 Ariz. 318 [100 Pac. 807], citing *Phelps* v. *Mayers*, 126 Cal. 549 [58 Pac. 1048], which cites *Brickell* v. *Batchelder*, and *Clemens* v. *Luce*, 101 Cal. 432 [35 Pac. 1032] ; *Castor* v. *Muramoto et al.*, 69 Wash. 145 [42 L. R. A. (N. S.) 108, 125 Pac. 153].)

It would be difficult to point out any distinction, except in the manner of expressing the proposition, between the above cases, and the case here. Here the language is that after the payment of certain costs, etc., the moneys received from the sale of the property under the decree of foreclosure shall be applied to the payment of the whole amount of the mortgage debt.

We now come to a consideration of section 4 of article V, hereinabove referred to, and also subdivision "d" of section 1 of said article. As will be seen, the provisions of section 4 are to the effect that upon the happening of any one or more of the events of default, the trustee may, or if requested in writing by the holders of a specified amount of the bonds, must by written notice delivered to the defendant declare the principal of all bonds to be due and payable immediately. The construction of said provisions by counsel for plaintiff as given in their brief is, in our opinion, a correct view of the meaning and the purpose thereof. We

therefore adopt as a part of this opinion the language of said brief dealing with said section 4, as follows:

"The only real purpose of this provision is to enable the trustee to apply any moneys which it received by virtue of its rights of entry on the mortgaged property to the payment of the principal of the bonds. Article V of the mortgage gives the trustee several rights in the event of default in any of the terms of the mortgage; and one of these rights is to enter upon the mortgaged property in the event of default; the mortgage saying, in this particular, that the trustee may 'enter into and upon and take and hold possession of all and singular the premises, estates, franchises, privileges and property hereby granted and mortgaged . . . and may exclude the Company . . . therefrom, and . . . may operate the same . . . and receive all rents . . . and income of all property hereby mortgaged.' Section 2 of Article V, of the deed of trust, provides that after paying all the expenses of operating the property, 'the Trustee shall apply the money received as aforesaid, first, to the payment of accrued interest, together with interest on the overdue installments thereof at the same rate, and next to the payment of the principal of all bonds hereby secured, and then payable.' If the trustee took advantage of these provisions of the mortgage, and went into possession of the property upon default, and collected certain moneys by the operation of the property, it could not apply any money to the payment of the principal of the bonds unless the bond issue had been matured by some provision of the mortgage. This provision for acceleration of maturity, therefore, is in order to enable the trustee to be in a position to apply the moneys so received to the payment of the bonds, if it so desires, and it serves no useful purpose if the trustee decides to foreclose the mortgage by a suit in equity, because those rights are conferred upon it by other provisions of the instrument; and it does not have to declare the principal due by notice, in order to bring the suit."

Section 4 provides for one of the several alternative remedies made available to the trustee and the bondholders. It is important to note that its language is that the trustee *may* proceed as therein specified, unless the holders of a named per cent in amount of the bonds, by writing, request

it to proceed as specified therein, in which case it *shall* adopt that remedy. In other words, such a request by such bondholders is peremptory, and the trustee in that case must so proceed. But, as stated, it may or may not act pursuant to the provisions of said section, unless the bondholders require it in the manner prescribed, and the latter may or may not make the request that the trustee so proceed. There are other remedies afforded the trustee by the indenture by means of any one of which its rights and those of the bondholders as well as those of the defendant may be conserved and protected. And peculiarly proper to the exercise by the trustee of the remedy afforded by the provisions to which section 4 applies is the requirement that, before the whole of the principal debt shall be declared to be due and payable, written notice thereof shall be given to the defendant; for the remedy thus provided for is manifestly of a summary nature, in that it authorizes the taking possession and the control and management of the mortgaged premises and the exclusion therefrom of the defendant, and is in positive contrast to the remedy by foreclosure in a court of equity, where every equitable consideration is vouchsafed to the defendant by the deliberate and care-taking method inherently characteristic of the practice in a court of conscience. This proposition is clearly, forcefully, and logically discussed by Judge Brewer, then United States circuit judge, later one of the justices of the United States supreme court, in *Mercantile Trust Co.* v. *Missouri, K. & T. Ry. Co.*, 36 Fed. 221 [1 L. R. A. 397], in which a situation similar to that here existed. (See, also, *Farmers' Loan & Trust Co.* v. *Chicago & N. P. R. Co.*, 61 Fed. 543.)

The trustee in this case did not elect to invoke the remedy provided in section 5, article V, by entering upon and taking possession and assuming control and management of the mortgaged premises, nor was it requested so to do by the bondholders, they obviously preferring to proceed by the remedy of foreclosure by authority of section 1 and the succeeding sections of article V.

As seen, section 7 of article V specifically provides that no remedy of the several conferred upon or reserved to the trustee or bondholders by the indenture, "is intended to be exclusive of any other remedy, but every remedy in this in-

denture provided shall be cumulative, and shall be in addition to every other remedy given hereunder, or *now or hereafter existing at law or in equity or by statute.''* Each of the remedies, as has been previously stated, is separate and distinct from the other and is to be invoked and exercised exclusively according to the terms of the particular provision of the mortgage authorizing its exercise. Nowhere in any section of article V or elsewhere in the mortgage, where proceedings in foreclosure are authorized or mentioned, is there a word which may be so construed or interpreted as to justify the conclusion that precedently to the right of the trustee to foreclose for the whole of the principal debt prior to its maturity by reason of default in the payment of interest, or default in the compliance with any other vital covenant or provision of the instrument, the trustee is required first to declare the whole of the principal due and payable. If there was the least ambiguity in the language of any of the other sections of article V as to this proposition, section 6 of said article, above herein quoted, makes it perfectly clear that it is not necessary, before foreclosure proceedings may be brought for the recovery of the whole of the principal debt prior to the maturity of the same that there should be notice delivered to defendant to that effect. But there is no ambiguity in the language of any of said sections in that particular; nor is there any inconsistency between them. Where, under the mortgage here, default in the payment of the interest has continued for sixty days, all that is required to effect an acceleration of the maturity of the entire amount of the principal debt is to commence suit to foreclose the mortgage for the entire indebtedness, principal and interest. The commencement of the suit for the whole debt is itself notice of the acceleration of the maturity of the bonds.

In this case not only did the first default in the payment of interest continue for sixty days before the commencement of the action, but, according to the uncontradicted testimony of the trust officer of plaintiff, there were three successive interest periods in which the defendant defaulted. Moreover, the defendant was in default in its agreement to create the sinking fund from which it agreed to pay the trustee the sum of $10,000 at the time and for the purpose above

explained. These defaults the defendant was fully aware might occur, and would have actual knowledge of their occurrence and further knew that they authorized the trustee to proceed to collect the whole debt, principal and interest. Why, then, the necessity for giving notice to the defendant declaring the whole of the principal debt due before it could sue in foreclosure? These considerations support the view that there was no intention to provide for such notice as a prerequisite to the exercise by plaintiff of the right to proceed to the collection of the entire debt through foreclosure proceedings.

Subdivision "d" of section 1, article I, was no doubt intended to cover or meet contingencies which might arise other than those specifically mentioned in said section and other sections, as, for instance, failure by the defendant to pay any taxes, assessments, or other expenses which might become a burden on the mortgaged premises not specifically referred to or provided for. But whatever its purpose, it is, as pointed out, one of the alternative provisions of section 1 of article V, so cannot reasonably be construed or intended to qualify or affect any of the other provisions of the instrument relating to remedies.

 3. The contention under this assignment is that the defendant is not a proper party defendant, because it failed to pay its license and franchise tax for the year 1921, such tax having become delinquent in the latter part of February, 1922, and the defendant thereupon "suspended and incapable of being exercised for any purpose or in any manner, except to execute and deliver the deeds to real property in pursuance of contracts made prior to such time *and to defend in any court any action brought against said corporation* (italics ours) until said tax with accrued penalties and taxes and charges due to the state under this act and subdivision . . . are paid." (Stats. 1917, p. 377.) This action was commenced March 25, 1922, or several weeks subsequent to the suspension of the defendant and its corporate rights, privileges, etc., except such as the statute expressly saves to it, as above indicated. The fact of suspension and the fact that the penalties, etc., have not been paid are admitted. The argument of counsel for the defendant is that the above section of the Statute of 1917 "applies

only to such corporations against whom suits have been filed prior to their suspension or forfeiture.'' Under the old law, of which the Statute of 1917 is amendatory, when a corporation failed to pay its license and franchise tax it ceased to exist or was dissolved. No action could then be brought against it, but could be brought against the directors as trustees. It will be noted from the above quotation from the Statute of 1917 that a corporation suspended or its franchise forfeited by reason of its failure to pay its franchise and license tax may defend in court any action brought against it. The provision is merely remedial and can affect no substantial right of the suspended corporation. There is, therefore, no reason for holding that an action may not be brought against the corporation, at any time within the statutory period of limitation, as well after such suspension or forfeiture as before.

The cases cited by the defendant upon all the points herein discussed have been carefully examined and found either not to be in point or not to announce any conclusions at variance with those arrived at herein.

The judgment is affirmed.

Plummer, J., and Finch, P. J., concurred.

A petition by appellants to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 26, 1928.

All the Justices present concurred.