[Civ. No. 885. Fourth Appellate District.—July 29, 1932.]

In the Matter of the Estate of BENIGNO BARREIRO, Deceased. MARIA TERESA BARREIRO et al., Minors, etc., Appellants, v. BANK OF ITALY NATIONAL TRUST AND SAVINGS ASSOCIATION (a Corporation), as Executor, etc., Respondent.

158

Jesse George and C. A. Brinkley for Appellants.

Wright & McKee and C. M. Monroe for Respondent.

MARKS, J.—Benigno Barreiro, citizen of the United States, resident of San Diego, died testate on June 4, 1925, leaving as heirs his three minor children, Maria Teresa Barreiro, Benigno Barreiro, Jr., and Oscar Barreiro. He had been divorced from his wife, Gertrudis Marquez Barreiro, on December 29, 1923. The decree of divorce was silent as to any division of the community property, leaving them tenants in common with an equal interest therein.

Benigno Barreiro owned property in California and in Mexico, and conducted a considerable mercantile business in the latter country originally under the name "Barreiro & Co." In 1920 he organized a Mexican corporation, the Compania Mercantil Internacional, S. A., hereafter referred to as the "Compania Internacional", through which he transacted his mercantile business in Mexico and which held the legal title to his property in that country. At some date, probably early in 1922, he discontinued the operations of the Compania Internacional except for the purpose of its liquidation. Victoriano Sanchez was appointed its liquidator with the apparent object of collecting in and distributing its assets and otherwise winding up its affairs. Accounts receivable and promissory notes of the total face value of about $30,000 (whether in Mexican money or that of the United States is uncertain) came into his possession. As far as the record discloses, no accounting was obtained from him by the deceased and none has been made to the executor. Miguel Gonzales purchased the other and remaining personal property of this corporation for $250,000, payable part in cash, the balance being evidenced by promissory notes. The certificates of stock of the Compania Internacional have not been found, but it is probable that Mr. Barreiro owned all of them with a community interest in his wife.

Mr. Barreiro organized another Mexican corporation, the Compania de Inversiones de la Baja California, hereafter referred to as the "Compania", to which was deeded all of the Mexican real estate of the Compania Internacional, except one lot in the city of Mexicali, title to which remained in the original corporation. After 1922 the business of Mr. Barreiro in Mexico consisted mainly of leasing the real estate there.

The capital stock of the Compania was divided into 1,000 shares of the par value of $100 each, Mexican money, which would be equivalent to $50 in money of the United States at the rate of exchange prevailing at that time. All of the stock was issued to bearer and was found in the possession of Mr. Barreiro at the time of his death. He evidently assumed that he owned all of the corporate stock as he disregarded the rights of his divorced wife in the interest which she took at the time of the divorce as tenant in common with him.

Deceased left two testamentary instruments which have been construed as his last will and a codicil thereto and have been admitted to probate as such. They were offered for probate by the Southern Trust & Commerce Bank, a California banking corporation, with its principal place of business in San Diego, together with a petition for its appointment as executor, which petition was granted. The bank immediately qualified and entered upon the discharge of its duties with Norman R. Morison, its trust officer, assuming active charge of the affairs of the estate.

On the same day that the will was admitted to probate, Norman R. Morison was appointed sole guardian of the estates of the minor children. He qualified and acted as such guardian until May 12, 1927, when his resignation was accepted and Dean M. Plaister, an official of the Bank of Italy National Trust and Savings Association, was appointed and qualified and continued to serve until January 17, 1929, when he resigned and Robert L. Cardenas and Charles A. Brinkley were appointed in his stead. They qualified and are now acting in such capacity. Mrs. Barreiro is the appointed, qualified and acting guardian of the persons of the minors.

The Southern Trust & Commerce Bank was sold to the Bank of America. The Bank of America consolidated with the Liberty Bank and was known as the Liberty Bank of America. The Liberty Bank of America was sold to the Bank of Italy, which was converted into a national banking association known as the Bank of Italy National Trust and Savings Association.

A first executor's account was filed by the Southern Trust & Commerce Bank; a second by the Liberty Bank of America; and a third by the Bank of Italy National Trust and Savings Association, all of which were settled and the orders settling them were allowed to become final. The Bank of Italy National Trust and Savings Association filed a fourth annual account to which objections were filed by the minors and removal of the executor from office was asked. After a lengthy contest the trial court ordered a full and detailed account of matters not directly covered in any of the other accountings. Amended and supplemental accounts were filed to which the minors objected and another extended hearing was had. The trial court settled certain

portions of the account, overruling objections to some of its items and reserving its rulings on others. It virtually surcharged the executor's account with certain expenditures which it held were illegally made, but not with the full amount which the minors sought to have charged against it. The removal of the executor was refused, the court holding that it had succeeded to the office originally occupied by the Southern Trust & Commerce Bank.

On November 13, 1929, the trial court filed findings of fact and conclusions of law in which the various changes from the Southern Trust & Commerce Bank to the Bank of Italy National Trust and Savings Association were found in detail, and it was concluded therefrom that the Bank of Italy National Trust and Savings Association had succeeded to the office of executor and was then the duly qualified and acting executor of the estate. On November 21, 1929, a judgment was filed in which the following appears: "Now, Therefore, it is ordered and decreed that the Bank of Italy National Trust and Savings Association by reason of successive transfers and mergers and by operation of law has become and now is vested with the office of executor of the last will and testament of said. Benigno Barreiro, deceased. That the petition for the removal of the Bank of Italy National Trust and Savings Association from the office of executor of the last will and testament of said Benigno Barreiro, deceased, be and the same is hereby denied."

After the filing of the amended and supplemental accounts, and objections thereto, a hearing was had and this question of the succession of the Bank of Italy National Trust and Savings Association as executor was again considered by the trial court, for it again made and filed findings of fact and conclusions of law on June 27, 1930, in accordance with those of November 13, 1929, and incorporated in this judgment a paragraph similar in effect to the one we have quoted from the judgment filed on November 21, 1929. The judgment of June 27, 1930, is the one attacked on this appeal as well as the minute order of November, 1929.

Appellants' specifications of error upon which they rely for a reversal of the judgment contain the following: "Appellants maintain that the Honorable Superior Court erred in the following particulars, viz.:

"One: In finding and holding that the Bank of Italy National Trust and Savings Association lawfully succeeded to the office of Executor by means of the series of purchases and sales set forth in Finding IV of the Findings of November 13, 1929, without appointment or letters, and without having taken the oath of office, and in recognizing it as anything other than an intermeddler required to account as such.

"Two: In finding and holding that the so-called Mexican corporation, Compania de Inversiones de la Baja California, S. A., ever had a separate existence apart from the decedent, Benigno Barreiro, during his lifetime and apart from the Executor after his death.

"Three: In holding under the facts found that the said Corporation, Compania de Inversiones de la Baja California, was legally organized on July 9, 1926, by the Executor, or at all, and holding that all or any of the irregularities, defects or illegalities in the said reorganization and conduct of the said Compania have been waived by the appellants, and that no damage has or will result to the appellants from said reorganization.

"Four: In finding and holding that the Estate of the decedent has not been damaged or prejudiced, nor put in jeopardy of damage and prejudice by the failure of the Executor to have ancillary administration of the estate in Mexico. . . .

"Six: In refusing to discharge the Executor Bank as required by section 1626 of the Code of Civil Procedure, even if it ever had a status as executor, for acts of waste, mismanagement, neglect, and embezzlement actually found by the court, and other like acts established by the evidence and which should have been found by the Court. . . .

"Eight: In refusing to surcharge the Fourth Account as supplemented and amended, for losses suffered through waste, neglect, and embezzlement in the following sums in addition to the amount of the actual surcharge ordered, viz.: (a) In the sum of $8799.63 overpayments to and embezzlements by Manuel Lujan, instead of the sum for which it was actually surcharged on that account amounting to $4732.95 net. (b) In the sum of $16,986.00 principal of the so-called Cardinale notes and interest thereon at seven per cent per annum from the date of said notes, September 18, 1924, for

negligently failing to collect said notes. (c) In the sum of $6500.00 principal of the Alfred H. (Ed.) Johnson note and interest at ·seven per cent from the date of the death of the decedent, outstanding and uncollected and now uncollectable. (d) In the sum of $14,000.00 for failure to collect from Victoriano Sanchez, liquidator of the Compania Mercantile Internacional. (e) In the sum of $35,000.00 loss on the sale of the Tia Juana real property, fractional portions of lots 9 and 10, block 40, Tia Juana, Mexico, according to old plat thereof sold to Mariano Escobeda and the Compania Commercial S. A. for $35,000.00 less than the fair market value. (f) In the sum of $13,895.00 spent in speculation on the mining claims. (g) In the sum of $500.00 per month from the date of the death of the decedent, loss suffered from the renewal of the leases with the Compania Commercial owned by Miguel Gonzales after he had offered to surrender and cancel them. (h) In the sum of $50.00 per month from January 1, 1929, rental of store room occupied by Eustachio Valle. (i) In the total sum of $3605.75 payments to Ernestine Belindez on her fifth class claim before delinquent income and Federal Estate taxes drawing 12 per cent interest were paid. . . .

"Ten: In suspending, postponing and reserving decision upon and deferring for further hearing the following issues and matters presented for determination, viz.: (Consisting of a restatement of subdivisions *a, b, c, d,* and *f,* of specification eight just quoted.) . . .

"Twelve: In failing to make findings and conclusions upon and to determine and adjudicate the following matters on issues squarely presented for determination and adjudication, viz.: (a) The misconduct and negligence of the Executor Banks in entering into the contract Exhibit A with Gertrude Marquez Barreiro, agreeing that one-half of the property of the estate should be set aside and distributed to her, and that her share should be placed in trust with the said Banks during her lifetime, and in demanding that she execute a trust agreement in accordance with said contract and offering to allow a distribution of a full one-half of the property to her if she would execute such trust agreement, engaging the estate in a prolonged, void proceedings in partial distribution because of her refusal, claiming and collect-

ing fees for extraordinary services in said void proceedings and afterward having said proceedings set aside as void.''

Many other specifications of error are made but have been omitted here as they are a restatement of those already quoted, couched in different language or necessarily involved therein.

We will have occasion to refer to code sections relating to probate and guardianship proceedings. All such references will be made to the sections of the Code of Civil Procedure in effect at the time the questions discussed here arose and not to the Probate Code now in effect.

Appellants' first contention, that the Bank of Italy National Trust and Savings Association did not lawfully succeed to the office of executor by means of the series of purchases and consolidations, presents a question which has not been definitely decided in this state. As a first answer to this contention, respondent urges that this matter is *res judicata* and cannot properly be considered on this appeal and relies upon the following facts: Appellants' original objections to the fourth annual account presented the issue as to whether or not the Bank of Italy National Trust and Savings Association had succeeded to the office of executor and requested its removal from office as an interloper. Thereupon the executor filed a petition seeking an order that it had succeeded the Southern Trust & Commerce Bank as executor. By a minute order made on September 13, 1929, the petition to remove the executor was denied and the petition of the bank was dismissed on the ground that the order sought was unnecessary. The minute order was followed by the formal judgment of November 21, 1929, which we have already quoted. While respondent has presented forceful arguments in support of its contention, we prefer to place our conclusion that the respondent is now the due and lawful executor of the will of deceased upon other grounds. Whether this order, under the circumstances, could be interlocutory, is a question that seems not to have been determined in California and authorities in other jurisdictions are not in harmony.

The various mutations by which the Southern Trust & Commerce Bank finally was purchased by and consolidated into the Bank of Italy National Trust and Savings Association have been fully set forth in the opinion of the Honor-

able Charles C. Haines, trial judge, as follows: "On December 31, 1926, under the provisions of section 31 of the California Bank Act, the Southern Trust and Commerce Bank sold its business, including its Trust Department, to the Bank of America, which had trust powers and was authorized to do business as a trust company in this state. Before the sale was completed the Bank of America and Liberty Bank consolidated under the provisions of section 31a of the California Bank Act and continued its corporate existence under the name of 'Liberty Bank of America', which likewise had trust powers and was authorized by law to transact business as a trust company in this state. In January, 1927, the State Superintendent of Banks approved the sale of the Southern Trust and Commerce Bank to the Liberty Bank of America and thereupon the trust business of the Southern Trust and Commerce Bank was transferred to the Liberty Bank of America. On the 15th day of February, 1927, the Liberty Bank of America, under the provisions of section 31 of the California Bank Act, sold all of its assets to the Bank of Italy and said sale was approved by the Superintendent of Banks of the State of California, and thereupon the trust business of the Liberty Bank of America was thereafter transferred to the Bank of Italy, which was a state institution and had trust powers and was authorized by law to do business as a trust company in this state. On the 1st of March, 1927, the Bank of Italy under the provisions of section 5154 of the Revised Statutes of the United States was converted into and became a national banking association under the name of Bank of Italy National Trust and Savings Association with its principal place of business at San Francisco, California. Immediately upon its conversion into a national banking association, Bank of Italy National Trust and Savings Association made the deposits required by law and received from the Federal Reserve Board and from the Superintendent of Banks of the State of California permits and certificates authorizing it to do business as a trust company in this state." These transitions involve purchases under section 31 of the California Bank Act (Stats. 1909, p. 87, as amended), and consolidations under section 31a of the same act, together with the reorganization of a state bank into a national banking association under sections 35 and 36 of chapter 2 and section 248 of

chapter 3 of title 12 of the United States Code Annotated. A decision of the interesting question presented requires careful consideration of portions of these sections.

Section 31 of the California Bank Act, dealing with the sale and purchase of banks, in effect at the time of the above purchases, contains the following provisions: "Upon the approval by the superintendent of banks of an agreement of sale and purchase and the transfer of the business of a trust department or of a bank having a trust department the purchasing bank shall, *ipso facto* and by operation of law and without further transfer, substitution, act or deed, and in all courts and places, be deemed and held to have succeeded and shall become subrogated and shall succeed to all rights, obligations, properties, assets, investments, deposits, demands, contracts, agreements, court and private trusts and other relations to any person, creditor, depositor, trustor, principal or beneficiary or any court or private trust, obligations and liabilities of every nature, and shall execute and perform all such court and private trusts in the same manner as though it had itself originally assumed the relation or trust or incurred the obligation or liability."

Section 31a of the same act, governing the consolidation of banks, provides in part as follows: "When the superintendent of banks issues the certificate of authorization provided for by section one hundred twenty-eight of this act the new or consolidated corporation shall be a body politic and corporate by the name stated in the certificate, and for the term of fifty years, unless it is, in the articles of incorporation and consolidation, otherwise stated and thereupon each constituent corporation named in the articles of incorporation and consolidation must be deemed and held to have become extinct in all courts and places, and said new corporation must be deemed and held in all courts and places to have succeeded to all their several capital stocks, properties, trusts, claims, demands, contracts, agreements, assets, choses, and rights in action of every kind and description, both at law and in equity, and to be entitled to possess, enjoy and enforce the same and every thereof, as fully and completely as either and every of its constituents might have done had no consolidation taken place. Said consolidated or new corporation must also, in all courts and places, be deemed and held to have become subrogated to its several

constituents and each thereof, in respect to all their contracts and agreements with other parties, and all their debts, obligations and liabilities, of every kind and nature, to any persons, corporations, or bodies politic, whomsoever, or whatsoever, and said new corporation must sue and be sued in its own name in any and every case in which any or either of its constituents might have sued or might have been sued at law or in equity had no such consolidation been made.''

Sections 35 and 36 of chapter 2, title 12, United States Code Annotated, provide for the reorganization of state banks into national banking associations. Section 248 of chapter 3 of the same code provides that a national bank when not prohibited by state or local laws may have ''the right to act as trustee, executor, administrator, registrar of stocks and bonds, guardian of estates, assignee, receiver, committee of estates of lunatics, or in any other fiduciary capacity in which State banks, trust companies, or other corporations which come into competition with national banks are permitted to act under the laws of the State in which the national bank is located''.

We cannot see how the legislature could have been more explicit and clear in the language it used in the subdivision of section 31 of the California Bank Act which we have quoted in specifying the right of the purchasing bank to *ipso facto* succeed to all of the rights, privileges and benefits of the purchased bank without any further court or other proceedings. It would do violence to the plain language of this section to hold that a purchasing bank would not automatically succeed to the office of executor held by the purchased bank, unless the language of the Bank Act be modified by some other statutory enactment or be repugnant to some provision of our Constitution. This perhaps explains the scarcity of decisions in California upon this question. However, two recent decisions are of assistance to us in construing this section.

In the matter of the *Estate of Barnett,* 97 Cal. App. 138 [275 Pac. 453, 454], the Bank of Italy National Trust and Savings Association, the same corporation that is before us here as executor, filed its annual account as trustee under the will of Melancton Barnett, deceased. It asserted its right of succession from the original corporate trustee appointed in the decree of distribution of the probate court

to the office of trustee of this trust estate following various purchases, consolidations and mergers with its predecessors. The beneficiaries under the trust objected to the account filed by the Bank of Italy National Trust and Savings Association upon the ground that it could not succeed to the office of the original trustee merely by operation of law resulting from these sales, consolidations and mergers. The court held adversely to this contention and in so doing said: "Sections 31, 31a, and 31b of this act provide for the transfer of the business of banking corporations by sale, by consolidation and by merger. Each section makes special provision for the transfer of trusteeships by such corporations, the provisions of section 31 relating to a sale reading, in part, as follows: 'Upon the approval of the superintendent of banks . . . the purchasing bank shall *ipso facto* and by operation of law and without further transfer, substitution, act or deed, and in all courts and places, be deemed and held to have succeeded . . . to all rights, obligations, . . . court, and private trusts and other relations to any . . . principal or beneficiary of any court or private trust'. With this statute before it, it became the duty of the court sitting in probate to recognize the respondent as the new trustee and that court was without jurisdiction to hear or determine any protest on the part of the beneficiaries to the statutory substitution of the trustee, unless the statue is void as offending some constitutional provision.''

The case of *Bank of America of California* v. *Granger*, 115 Cal. App. 210 [1 Pac. (2d) 479], also furnishes us with authority for the conclusion that the office of executor passed to the Bank of Italy National Trust and Savings Association by operation of law. This case involved purchases and consolidations of state banks under sections 31 and 31a of the California Bank Act. While the question of the right of a purchasing bank to automatically succeed to the trusts held by the purchased bank, or the right of a consolidated bank to succeed to those of its component parts was not particularly discussed in the opinion, it was of necessity before the court and the conclusions there reached could not have been arrived at had not the court been of the opinion that all of the rights of the predecessor banks merged in the successor banks by operation of law under the

provisions of the two sections of the California Bank Act from which we have quoted.

Section 31a of the California Bank Act is also clear and specific in its terms. Its provisions have been thoroughly discussed in the case of *Mercantile Trust Co.* v. *San Joaquin Agr. Corp.*, 89 Cal. App. 558 [265 Pac. 583, 585]. This case involved the right of a bank, after consolidation, to receive and exercise a trust in which the bank with which it had consolidated was named as trustee. In reaching the conclusion that the consolidated bank succceded to this office by operation of law under the provisions of section 31a of the California Bank Act the court said: "It is not claimed here, nor could it be, upon any sound or reasonable basis or hypothesis, that the legislation involved in the foregoing section of the Bank Act in any manner or degree impinges upon or transcends any of the constitutional restrictions by which the legislative department of the state is hedged. Nor can it be doubted that where, as here, there is, in pursuance of the provisions of section 31a of our Bank Act, a consolidation of two banking corporations the result of which is to bring into existence a single corporation as the successor of the two, the former *ipso facto* succeeds to and is vested with ownership of the combined capital stocks, properties, trusts, contracts, etc., of the two several constituents of the corporation thus created. . . . The rule as thus stated is declared and expressed in section 4712, volume 7, of Fletcher's Cyc. Corp., as follows: 'When corporations are consolidated, the rights, franchises and privileges of the consolidated corporation depend upon the intention of the legislature as manifested by the statute authorizing the consolidation. The legislature may confer upon it, with the consent of the consolidating corporations, which consent is given impliedly by entering into the consolidation, all the rights, franchises, privileges and property of the consolidating corporations, or it may withhold some of them, or it may add to them new rights, franchises or privileges.' . . . (See, also, 5 Thompson on Corporations, secs. 6083, 6107 and 6111.)

"The banking laws of the State of Illinois, as well as those of the State of New York, in all vital respects, are substantially the same as those of California. The provisions in the statutes of those states relating to the merging and consolidation of banking corporations are practically

similar to those contained in section 31a of our own Bank Act. Especially illuminating and peculiarly pertinent to the present investigation, therefore, is the discussion in the decisions of the courts of those states in construing and expounding the several provisions of their statutes relative to banking corporations and the scope and the effect thereof with respect to the rights acquired and the obligations assumed by the offspring of the consolidation of two or more banking corporations. The case of *Chicago Title & Trust Co.* v. *Zinser et al.*, 264 Ill. 31, 35 et seq. [Ann. Cas. 1915D, 931, 105 N. E. 718], is, in the facts, strikingly similar to the case at bar, and discusses and disposes of several points advanced here. In that case a corporation named Real Estate Title & Trust Company of Chicago was made by one Etta Nelson the executor of her last will and testament. By her will she authorized said corporation, as her executor, to sell and convey the real estate of which she died seized. At the time the will was made the Real Estate Title & Trust Company and the Chicago Title & Trust Company were two distinct and unrelated corporations, each organized under and according to the laws of the state of Illinois and each vested with the power and right to accept and execute trusts and to be appointed assignee or trustee by deed, and also to be appointed executor, guardian, and trustee by will. Subsequently to the making of the will, and prior to the death of Etta Nelson, the two corporations were consolidated into one, under the name of Chicago Title and Trust Company, in pursuance of the statute of said state authorizing such consolidation. After due legal proceedings, letters testamentary were issued to the plaintiff (the consolidated corporation), and thereafter said plaintiff instituted a suit to compel the specific performance by the Zinsers of an agreement, entered into by and between the latter and the plaintiff after letters testamentary had been issued to the corporation, whereby the Zinsers agreed to purchase certain real estate belonging to the estate of the deceased. The suit was resisted upon grounds involving objections similar to some of those urged against the position of the plaintiff in the case now before us. The cause reached the Supreme Court of Illinois, and the action was by that court sustained in an opinion so clearly and satisfactorily disposing of the objec-

tions referred to that we feel that pardonably we may *in extenso* quote therefrom as follows:

" 'By the consolidation of the Real Estate Title & Trust Company and the Chicago Title & Trust Company the original corporations ceased to exist, and the appellee, as the consolidated corporation, acquired and succeeded to all the faculties, property, rights and franchises of its component parts and became subject to all the duties, obligations, and conditions imposed upon them. (*Robertson* v. *City of Rockford,* 21 Ill. 451; *Chicago, Rock Island & Pac. R. Co.* v. *Moffitt,* 75 Ill. 524.)

" 'The material question here is whether the general rule that a trustee cannot delegate his authority to another is an obstacle to the exercise of a power by the appellee to act as executor or trustee where one of the constituent corporations was named as such. That general rule rests upon the ground that the selection of a trustee implies personal confidence in his discretion and judgment. If a power is given to an executor or trustee which is not ministerial or given for the purpose of executing a declared trust which the court can enforce but which involves the exercise of discretion and judgment, the power cannot be delegated or transferred to another, either by the trustee or a court. The rule, however, cannot be applied to the case of a corporation, because the element of trust in the judgment and discretion of an individual is entirely wanting. A corporation is without personality, and if it is selected as trustee or executor there can be no reliance upon individual discretion or even upon the continuance of the same administration. Etta Nelson, in naming the Real Estate Title & Trust Company as executor and trustee, knew that its directors, officers, and stockholders might change from time to time, and that the statute authorized a change of name or place of business, enlargement, or change of the object for which the corporation was formed, an increase or decrease of capital stock or change in the number of shares or par value, increase or decrease of the number of directors, and the consolidation of the corporation with any other corporation then existing or that might thereafter be organized. She therefore contemplated that these changes might occur, and that the Real Estate Title & Trust Company might be consolidated with some other corporation such as the Chicago Title & Trust Company,

and that it would thereby cease to exist and become a component part of a new corporation. A consolidation took place and a new corporation was created from the original corporations, with an enlarged capital stock and unimpaired franchises. The appellee was entitled to execute the trust, and the chancellor did not err in overruling the demurrer.' To the same effect are the *Matter of the Will etc. of Bergdorf,* 206 N. Y. 309 [99 N. E. 714]; *McElwain Co.* v. *Primavera,* 181 App. Div. 929 [168 N. Y. Supp. 1134]; see latter case also reported in 180 App. Div. 288 [167. N. Y. Supp. 815]."

Under the banking laws of the United States the changing of a state bank into a national banking association does not destroy the identity of the original bank. All the assets and rights of the state bank pass to the national bank without any formal assignment and are subject to all the existing liabilities and obligations of the state bank as if the change had not taken place. (*Michigan Ins. Bank* v. *Eldred,* 143 U. S. 293 [36 L. Ed. 162, 12 Sup. Ct. Rep. 450]; *Metropolitan Nat. Bank* v. *Claggett,* 141 U. S. 520 [35 L. Ed. 841, 12 Sup. Ct. Rep. 60].) Where a state bank reorganizes into a national bank it passes from one jurisdiction to another but its identity is not thereby necessarily destroyed. It remains substantially the same institution under another name and subject to new control. (*Coffey* v. *National Bank,* 46 Mo. 140 [2 Am. Rep. 488]; *City National Bank* v. *Phelps,* 86 N. Y. 484.) With these rules before us the conclusion is inevitable that the transition of the Bank of Italy, a state institution, into Bank of Italy National Trust and Savings Association, a national bank, carried with it the office of executor of the last will and testament of Benigno Barreiro, deceased, by operation of law and without the necessity of court order.

Appellants seriously contend that jurisdiction over the estates of decedents is vested in the probate courts in California; that these courts have discretion in the appointment of executors given them by law; that an executor is required by law to take the oath of office after its appointment and that the provisions of the state and national banking acts must be construed with and modified by the provisions of the probate law of this state; that the Bank of Italy National Trust and Savings Association did not receive

its appointment as executor through an order of the probate court and did not qualify by having one of its officers take the required oath of office and that it cannot now be held to be the duly appointed, qualified and acting executor of the estate of Benigno Barreiro, deceased, but must be regarded and treated as an interloper in the office which it asserts it occupies; that the right to name the executor of his estate is a right belonging to a testator, and to hold that the office of executor would descend to a corporation not named as such executor would destroy the right of nomination by the testator.

Several of the foregoing objections are answered in the portion of the opinion in *Mercantile Trust Co.* v. *San Joaquin Agr. Corp., supra,* from which we have already quoted. Some are also considered in *Estate of Barnett, supra,* where the court said: ''But, to our minds, there is one principle which controls a situation of this kind and that is the principle of consent of the parties. The legislature, as we have stated, having the power to enact the legislation, and the trust having been created in contemplation of it, the consent of all parties to the legislative method of substitution of trustees must be deemed to have been given. Mr. Justice Hart, in the Mercantile Trust case, expressed the same thought in this language: 'The statute authorizing the consolidation or merger of banking corporations, in so far as it prescribes a scheme for the transfer of their properties, . . . enters into and becomes a part of every agreement or obligation . . . and of this the defendant (the trustor) its directors and bondholders, are presumed to have known before and at the time of the execution of the trust deed . . . and to have impliedly assented to the exercise of the legal right of said bank to merge . . . with all the consequences following such merger or consolidation as are prescribed by law.' The right of the trustor to provide a method of filling vacancies and for appointment of successors in the trust is not disputed. (26 R. C. L., p. 1278.) But when a trustor, in full contemplation of the provisions of the Bank Act relating to the sale, consolidation, or merger of banking corporations, voluntarily designates such a corporation as trustee he must be deemed to have adopted and included within his declaration of trust the full scheme for substitution of trustees prescribed in that act. No more

forceful application of this principle could be made than in a case such as we have here of a testamentary trust, because the right to make a testamentary disposition of property is not an inherent right, but one which depends entirely upon the consent of the legislature. Thus, when the legislature has prescribed the rules and conditions under which the disposition and administration of estates may be had, the testator is deemed to intend the result which such rules produce and 'they affect the testamentary disposition and provisions as though embodied in the will'.''

The same questions were considered in *In re Bergdorf's Will, supra,* from which it appears that the will of a decedent named the Morton Trust Company as his executor. Before his death the Morton Trust Company merged into another corporation known as the Guaranty Trust Company under the banking laws of the state of New York which contain provisions similar to those we have quoted from the California Bank Act. After the death of the testator the Guaranty Trust Company applied for letters testamentary which application was contested. In denying the contest and granting the letters to the Guaranty Trust Company the New York court said: ''It was within the power of the legislature to enact that a trust company, into which another trust company lawfully designated as an executor had been merged subsequent to the making and prior to the probate of the will, should be the transferee of the privilege or right of being the executor. . . . By virtue of the statute, effective as a part of the will, the Guaranty Company was designated as an executor and as such is entitled to receive the letters testamentary.'' *Chicago Title & Trust Co.* v. *Zinser, supra,* strongly supports this conclusion.

The case of *O'Rourke* v. *Standard Wood Turning Co.,* 204 App. Div. 658 [198 N. Y. Supp. 632], decides a question very similar to the one before us. An award under the Workmen's Compensation Law of the state of New York had been made to Bridget O'Rourke for the death of her husband. She had been declared incompetent and the Trust Company of America, a New York corporation, appointed committee of her property. The Trust Company of America merged with the Equitable Trust Company of New York which petitioned for the payment of the award to it as the successor of the Trust Company of America. In directing

the award to be paid to the Equitable Trust Company of New York, the court said: ''The merger was an equitable and ratable combination of the assets of each of said companies, becoming one instead of two bodies, and the taking of the one name for both companies. The question is asked: Is the relation of committee and incompetent a trust relation? In *Person* v. *Warren,* 14 Barb. 488, it is held that the committee is a trustee of an express trust although at the some time he is a servant or bailiff of the court. In *People ex rel. Smith* v. *Commissioner of Taxes,* 100 N. Y. 215 [3 N. E. 85], the court says: 'The office of committee is as well defined and specifically referred to in law and in the statutes, as that of guardian, executor or administrator.' The question here is the effect of the merger, and the force of the statute is pointed out in *Bank of Long Island* v. *Young,* 101 App. Div. 88 [91 N. Y. Supp. 849]. It is disclosed in *Matter of Bergdorf's Will,* 206 N. Y. 309 [99 N. E. 714], that the testator made his will in 1904, and he named, with others, the Morton Trust Company an executor thereof. In January, 1910, the Morton Trust Company merged into the Guaranty Trust Company. The testator died in January, 1911. It was held that the merger did not prevent the issuing of letters testamentary to Guaranty Trust Company. It is found by the Industrial Board that the compensation 'is due and payable to Bridget O'Rourke,' and directs its payment to her committee, the Equitable Trust Company of New York. I am of the opinion that said committee has authority to take it under section 494 of the Banking Law.'' It must be borne in mind that in this case there was no new appointment of a committee by the court after the merger and no showing of the new committee taking an oath of office.

In *Turner's Estate,* 277 Pa. St. 110 [120 Atl. 701], the orphan's court of Pennsylvania appointed a state trust company as guardian of the estates of minors. The trust company was afterward consolidated with a national bank which petitioned the orphan's court to order the guardianship funds turned over to it as guardian of the minors. The petition was denied by the orphan's court but upon appeal was reversed by the superior court, which order was affirmed by the Supreme Court of the state. In the opinion of the latter court no question of the necessity of an application for

letters of guardianship by the national bank after the consolidation was discussed, but a consideration of this question would seem to be necessarily involved in the decision and it must, therefore, be construed as indicating that the conclusion of the Supreme Court of Pennsylvania was that the office of guardian occupied by the state trust company under order of the orphan's court automatically descended upon the national bank at the time of the consolidation and that no application for appointment or oath of office by the national bank was necessary.

■ The next question involved in this appeal is whether or not the provisions of the California Bank Act, under which we have held that the office of executor descended by operation of law to a successor corporation, violates the provisions of section 5 of article VI of the Constitution of California (as amended November 4, 1924), which vested original jurisdiction of all probate matters in the superior court. Appellants insist that the power to select and appoint a new administrator with the will annexed is taken from the probate court upon the happening of the purchase or consolidation of an executor bank. A sufficient answer to this is found in the cases which we have already cited through which runs the principle that purchase or consolidation does not create an entire new entity but, to paraphrase the expression of a court of a sister state, merely directs the blood of the old corporation into the veins of the new, the old living in the new. ■ Further, the power to appoint a particular person or corporation as an executor or administrator concerns procedure in a probate court rather than its jurisdiction. A testator has the right to nominate the executor of his will and the probate court will appoint the nominee in the absence of legal disqualification. Section 1365 of the Code of Civil Procedure has long provided the rules governing probate courts in the order of priority which must be followed in appointing administrators. These provisions have been recognized as lawful under the Constitution and have never been held to interfere with the jurisdiction of the probate court in the administration of estates. By analogy we conclude that the holding that the office of executor descends to a purchasing or consolidated bank is not a violation of these constitutional provisions any more than it is a limitation on the probate court

in the appointment of an executor or administrator in the instances above specified. The power remains in the probate court to remove the successor bank from the office. if occasion should arise and the necessity for such action present itself.

We have reached the conclusion that the Bank of Italy National Trust and Savings Association succeeded to the office of the executor of the estate of Benigno Barreiro, deceased, without the necessity of court action and that it is the duly appointed, qualified and acting executor of that estate. We are aware that this conclusion is contrary to the weight of authority on this question in Massachusetts.

 Appellants' second specification of error naturally divides itself into two phases, namely : (1) Is the finding that the Compania had an existence separate and apart from deceased during his lifetime supported by the evidence? And, (2) is a like finding concerning the Compania and the executor supported by the evidence? We cannot see how the first of these two questions possesses any such materiality as to deserve extended discussion here. This appeal is taken in a probate proceeding, the purpose of which is to settle and distribute the estate of deceased under the terms of his will, and is from an order of the court made after extended hearings on an account. The executor was required to take charge of the property of the estate of the deceased as it existed at the time of the death. Whether or not deceased during his lifetime operated in Mexico through the Compania as his *alter ego* is no concern of the probate court, as the *alter ego* question between deceased and the Compania is not material and can have no bearing on the conduct of the executor in the administration of the estate. Whether or not the executor used the corporation as its *alter ego* in taking possession of and operating the properties of the Compania in Mexico is more directly involved in the appeal in case Civil No. 488 [*Estate of Barreiro,* ██ Cal. App.) 13 Pac. (2d) 1033], the opinion in which is this day filed and is referred to for a more extended discussion of and

decision upon this question. It is not necessary to repeat here the facts there stated nor the reasons given for upholding the conclusions of the trial court.

Appellants' third assignment of error is necessarily involved in the second phase of their second assignment and is also considered and decided in the opinion filed this day in case Civil Number 488 (*supra*), which we refer to and incorporate herein.

■ Appellants complain that the finding that the estate has not been damaged, prejudiced nor confronted with loss because of a failure to have ancillary letters of administration taken out in the Republic of Mexico is not supported by the evidence. In considering this question we must bear in mind that the principal estate of the deceased consisted of shares of stock of the Compania which were in his possession in California at the time of his death. This stock was personal property (secs. 657, 658, and 663, Civ. Code) and "if there is no law to the contrary, in the place where personal property is situated, it is deemed to follow the person of its owner, and is governed by the law of his domicile". (Sec. 946, Civ. Code; *Estate of Lathrop,* 165 Cal. 243 [131 Pac. 752].) Where there is no ancillary administration it has been held, on the grounds of comity, that the domiciliary representative may administer on stock of a foreign corporation and may be required to account for funds in a foreign jurisdiction of which it takes possession. (*Reed* v. *Hollister,* 44 Cal. App. 533 [186 Pac. 819] ; *Brown* v. *San Francisco Gas Light Co.,* 58 Cal. 426.) We have been cited to no law of the Republic of Mexico under which an administration by a California court on the stock of a Mexican corporation would not be recognized there. It appears from the record that proceedings to probate the estate were started in a Baja California court by officials of that state but were discontinued as unnecessary. The termination of this proceeding, if it can be considered terminated, seems to have met with the approval of the parties interested because of the great expense of such proceedings in Mexico which appear to be considerably larger than in similar proceedings in California. The assets of the estate in Mexico, exclusive of those whose title is of record in the Compania, are of comparatively small and questionable value. It was the conclusion of the trial judge that the value of the property to be

recovered to the estate by ancillary proceedings in Mexico would not exceed, and might be much less than, the cost of the proceedings to the estate. This conclusion is amply supported by the evidence and it does not appear that the lack of administration proceedings in Mexico has yet caused proven loss to the estate. It should be the object of the administration of an estate to conserve its assets and not waste them. Should it prove advisable to take out ancillary letters in Mexico at any time in the future there is nothing to prevent such proceedings being instituted.

Appellants, in addition to their objections to the fourth annual account and the amendments and supplements thereto, ask the removal of the executor under the provisions of section 1626 of the Code of Civil Procedure because of waste, embezzlement and mismanagement of the estate. They present many grounds in support of this petition, some of which are considered in this opinion, and others in the opinion in case Civil No. 488 to which we again refer for a discussion of these questions. Many of the grounds urged for the removal of the executor and a revocation of its letters concern matters directly involved in the first, second and third annual accounts which were heard and settled by the court in the regular course of the probate proceedings. No appeals were taken from the orders settling these accounts and inasmuch as they have now become final they are not subject to review here. (*Estate of Clary,* 203 Cal. 335 [264 Pac. 242].) Up to and including the settlement of the third account these include what appellants refer to as lavishing money upon the family of deceased and paying a family allowance out of all proportion to the assets of the estate and its income. These allowances, including those made after the settlement of the third account, were made upon petitions to and under orders of the court. They were large, and in view of the facts now disclosed as to the actual value of the estate and its present income, appear to have been extravagant, but this was undoubtedly due to a mistaken estimate of the actual value of the property belonging to the estate and the permanency of the very considerable income from this property which existed at the time of the death of Mr. Barreiro and for some little time thereafter. These mistakes were indulged in by Mrs. Barreiro, all the parties interested in the probate proceedings and their

then attorneys. They were honestly made and the amounts of the allowances can furnish no grounds for the removal of the executor under the facts disclosed by the record. The order settling the fourth account made a substantial reduction in the family allowance.

Appellants urge that their rights were not properly protected in the estate affairs and in the settlement of the first three annual accounts because Norman R. Morison and Dean M. Plaister, who were the guardians of their estates, were at the same time the trust officers of the executor and acting as its representatives in the active management of the affairs of the estate and therefore occupied adverse and hostile positions in the two offices. No suit in equity has been brought to vacate any of the orders settling these accounts. We cannot conclude that the sole fact of the same person being the guardian of the estates of minors who are distributees under a will, and at the same time in charge of the affairs of the estate for the corporate executor in itself demonstrates that he occupies two hostile and adverse positions rendering his acts conclusively illegal in either of them. It is a common custom to appoint the parent of minors, who take under a will, the executor of the will and the guardian of the persons and estates of the minors. That both these offices may be filled by the same person is recognized by the laws of this state. (Secs. 1365, 1751, Code Civ. Proc.) When both offices are held by the same person that fact of necessity is known to the court hearing the accounts. It may be a reason for a more careful scrutiny of such accounts but it cannot be said that one and the same person cannot fill both offices. The fact that one person fills both offices cannot be made the sole ground for his removal from either of them.

Appellants complain that the executor wasted large sums of money in needless and useless litigation. They have reference to litigation in the Republic of Mexico which we have considered in the opinion in case Civil No. 488 and to which we refer for a discussion of this question. They also refer to the litigation resulting in the decision in the case of *Estate of Barreiro*, 86 Cal. App. 764 [261 Pac. 509]. That proceeding was started by Mrs. Barreiro in her petition for partial distribution to her of that portion of the estate which she claimed belonged to her as "community

property'', in reality being the property which she owned as tenant in common with her husband after the divorce. This litigation arose out of a mutual mistake indulged in by all the attorneys then connected with the estate and the proceedings. They apparently assumed that Mrs. Barreiro would take the property which belonged to her, through the estate, rather than adversely to it. Her attorneys chose the forum in which she sought to assert her rights. She instituted the proceeding which was contested through all of the courts of this state having probate jurisdiction. The order of partial distribution which was made was vacated by the trial court on the ground that it was beyond the jurisdiction of a probate court. No appeal was taken from this decision. In his findings, conclusions and judgment under attack here, the trial judge held that as the mistake resulting in the order of partial distribution had been honestly made it afforded no ground for removal of the executor under the provisions of section 1626 of the Code of Civil Procedure. It is apparent from the record, and from the final order of the trial judge settling the account wherein he refused the allowance of further fees to the executor and its attorneys at that time, that in the future, in fixing fees for unusual services he will exercise a sound discretion taking into consideration the extra services performed and to be performed in the probate proceedings. Under this state of the record we conclude that the finding of the trial court, that the expenses of this litigation do not furnish grounds for the removal of the executor, finds support in the record.

Appellants further urge that the executor should be removed and its letters revoked because of a payment to Mrs. Barreiro of some $1300 under what is termed an ''advancement'' to her. She was given $1 under the will of deceased and was not entitled to receive any greater sum under the provisions of that document. This ''advancement'', of course, should not be credited as a lawful expenditure by the executor out of the funds of the estate, as Mrs. Barreiro, having been divorced from her husband, was neither his widow nor his heir at law at the time of his death. She was, however, the owner of a portion of the property in the possession of the deceased at the time of his death and which the executor took over when appointed

and has since held. These advancements should be charged against Mrs. Barreiro's portion of the property when it is carved out of the assets held by the executor and an accounting had between them. We believe that the trial court was justified in holding that these payments did not furnish any sufficient ground for the revocation of letters testamentary as the mistake was honestly made.

 Appellants complain of a finding of the trial court to the effect that the inventory and appraisement returned and filed in this proceeding was greatly in excess of the actual value of the property appraised. They direct their arguments chiefly to the appraisement of the shares of stock in the Compania. Three appraisers were appointed by order of court, one of whom was an inheritance tax appraiser. They appraised the 1,000 shares of stock in the Compania at $500,000, including within this appraisement the stock belonging to Mrs. Barreiro. It is of course immediately apparent that this was a mistake as the executor could not administer upon any property not owned by the deceased at the time of his death. The valuation placed upon this stock was seemingly measured by the income derived from rentals. This was an attempt to value property by its use rather than its market value. The difficulty of obtaining a reasonably accurate appraisement of this or like property of the estate may be demonstrated by an exhibit from the record showing appraisements of Mexicali property made over a short interval of time. For the purposes of illustration only here follow the total appraised values of practically the same properties: In Mexican money—the first, $399,256; the second, $399,256.98; the third, $1,040,064.76. The same properties appraised in money of the United States—the first, $131,500; the second, $199,268.34; the third, $111,500. The last appraisement in Mexican money, $1,040,064.76, seems to have been based upon cadastral values and is so in excess of the other appraisements as to cast a decided doubt upon the reliability of cadastral values as measures of the market value of property. We cannot disturb the finding of the trial court that the appraised value of the shares in the Compania was greatly in excess of its market value.

 Appellants complain of what are denominated in the accounts as "liquidating dividends" taken from the

Compania by the executor and used by it in paying the expenses of administration, the family allowances, repairs to the property in Mexicali damaged by earthquake, and other such purposes. The record discloses that in excess of $83,000 was so used. They maintain that this amounted to an unlawful distribution of the capital assets of the corporation and was conclusive evidence of waste, mismanagement and embezzlement of estate funds by the executor requiring its removal from office.

The Compania was incorporated with 1,000 shares of capital stock with a par value of $100 per share in Mexican money which would give a total capital value of approximately $50,000 in money of the United States at the rate of exchange prevailing at the time of the death of Mr. Barreiro. The excess of the actual value of the property owned by the Compania over the par value of its stock was more than $83,000. If the corporation were in California this excess could be considered as surplus, undivided profits, or a reserve for dividend purposes. The distribution of a portion of this surplus or undivided profits for the benefit of the stockholders would not in itself be illegal as the assets of the Compania were not reduced in value below the par value of its capital stock. The fact of the withdrawal of this money, in itself disassociated from the actual expenditures made, does not furnish grounds for the removal of the executor. ▪▪▪ The conclusions of the trial judge in refusing to revoke the letters testamentary and remove the executor from its office because of waste and mismanagement of the estate or embezzlement of estate funds were based upon a great mass of conflicting evidence. Some of this evidence sustains his conclusions that the executor was not guilty of the acts charged. We therefore conclude that the order refusing to remove the executor and revoke its letters finds support in the evidence and may not be disturbed by us. (*Estate of Bottoms,* 156 Cal. 129 [103 Pac. 849].)

We now pass to the consideration of the Manuel Lujan accounts, the so-called Cardinale notes, the Johnson note, the accounts of Victoriano Sanchez as liquidator of Compania Internacional, and money spent on the mining claims, upon all of which, except a portion of the Lujan accounts, the trial court reserved its ruling. The account of the executor was virtually surcharged in the net amount of

$4,782.95 to be paid to the Compania out of its own funds, and 500 out of the estate funds. This was held to have been illegally paid to Manuel Lujan. Appellants claim an additional amount of $3,506.68 should have been surcharged as having been illegally paid to Lujan. This latter amount was one among a number of items upon which the trial court reserved its ruling. Appellants complain of the refusal to surcharge the account with the various amounts upon which ruling was reserved. They maintain that all of these amounts should have been surcharged to the executor and it required to pay the money into the assets of the estate. We have examined the evidence and agree with the trial judge that in many respects the account is most incomplete and unsatisfactory. We can see no reason why he could not reserve his rulings upon the allowance or disallowance of any portion of the account wherein the evidence was unsatisfactory and incomplete. (*In re Farmers & Merchants Bank of Imperial,* 213 Cal. 33 [1 Pac. (2d) 422].) It would be a manifest injustice to the executor to surcharge the account with items if the payments were lawfully made and would be a like injustice to the distributees to fail to surcharge the account with them if they were not made in accordance with law. The right of a probate judge to reserve his rulings upon any items of an account concerning the legality of which there is reasonable question was recognized in the early case of *Reynolds* v. *Brumagim,* 54 Cal. 254, where it was said: ''The court could in terms have settled the account as rendered, expressly reserving all questions as to liability for the omission now complained of.''

 Appellants make one further criticism concerning the account of Manuel Lujan of which we must take notice. The trial judge found that Lujan had received from the executor and the Compania $10,050. Appellants assert he received an additional amount of $300 which the court failed to consider and which should have been surcharged against the executor. Without making any further explanation or comment upon this payment they merely refer to the clerk's transcript ''Volume Two, page 431''. On this page appears the following entry under date of January 1, 1927: ''Southern Trust & Commerce Bank sight draft drawn by L. Lujan, $300.00.'' We presume that in the long record

before us there is some valid explanation of this payment to Lujan and vouchers therefor. Error cannot be presumed and we do not feel called upon to search the entire record to determine whether or not this expenditure, relatively small in amount, was legally made. We rely upon the well-established rule that error is not presumed and that an appellant must show error before an appellate court can hold that it has been committed by the trial court.

Appellants complain of the ruling of the trial court in refusing to surcharge the executor's account with $35,000, alleged to have been lost on the sale of Tia Juana real property; with $500 per month on the lease with the Compania Commercial; with $50 per month rent of a storeroom occupied by Eustaquio Valle, and with loss of interest from the payment of the claim of Ernestine Belindez. The trial court found against appellants on these items and that no loss resulted to the estate therefrom. This finding is attacked as not supported by the evidence and contrary to it.

The real property in question consisted of portions of lots nine and ten in block forty, Tia Juana, Mexico. These were sold to Mariano Escobeda and the Compania Commercial then owned by Miguel Gonzales. Escobeda paid $25,000 in lawful money of the United States for one portion of the property, the Compania Commercial paying $15,000 in like money for the other. The portion of the property purchased by Escobeda had been rented to him by deceased at $300 per month, and that purchased by the Compania Commercial had been rented to it at $100 per month. Appellants maintain that this last lease was very much below what it should have been and that it could have been rented for from $300 to $350 per month. They argue that this property should have been producing a net revenue of seven per cent upon a valuation of $80,000. They produced two witnesses who attempted to testify as to the reasonable market value of the property. One Silvio Blanco, a business man and resident of Tia Juana, estimated the fair market value of the property at $65,000. It was evident from his testimony that this value was based largely upon its rental value. He knew of no sales of, nor offers for, similar property in that city. The other witness, Juan J. Cervantes, an engineer in the Department of Public Works of Tia Juana, estimated the value of the property at between

$68,000 and $75,000. He knew of no sales of, nor offers for, similar property in Tia Juana but seemingly placed his valuation on what is known there as cadastral values. Fixing market values in Tia Juana according to standards adopted in the United States was a very difficult problem as there was no available evidence of sales of property in that city and the estimates of values given by these witnesses were based upon rentals. The futility of attempting to fix the market value of these properties by the rentals produced at a given time is immediately apparent from the record. The properties of the estate in Mexico were used for the sale of liquor and kindred enterprises which are prohibited by law in California. These uses are not stable and rentals fluctuate with the conditions of business prevailing in the different localities. Property belonging to the Compania in the city of Mexicali which a few years ago rented for several hundred dollars a month is now untenanted. It nowhere appears in that portion of the record cited by appellants whether the valuation placed upon this property by either of the above witnesses was in Mexican money or in money of the United States. If it were in Mexican money it would make their estimated valuations, measured in money of the United States according to the rate of exchange prevailing at that time, not more than $37,500, or $2,500 less than the executor actually received for the property.

Just before the sale of the Tia Juana real estate, the property belonging to the Compania in the city of Mexicali had been seriously damaged by earthquake and repairs were necessary to keep it suitable for rental purposes. The greater portion of the income of the estate was derived from rentals there. Sufficient funds were not available for these repairs and it seemed necessary to sell the Tia Juana property. Accordingly the executor made efforts to secure a purchaser. The best price offered for the property as a whole was $25,000. With the exercise of considerable diligence and effort no purchaser could be found who would pay more than $40,000. This was the amount actually received.

Courts have experienced considerable difficulty in arriving at a rule which will always govern the fixing of the market value of property where there has been no actual demand

for it, or where there have been no sales of similar property in the neighborhood. In the case of *San Diego etc. Co.* v. *Neale,* 78 Cal. 63 [3 L. R. A. 83, 20 Pac. 372], such a situation was before the Supreme Court. In that case it was held that the value of the use of property, or its rental value, could not be used solely as a basis for fixing its market value; that by market value was meant the price the owner could obtain after a reasonable effort over an ample period of time in finding a purchaser and making a sale of the same or similarly situated property. While the value of the use of property, or in other words, its income, may be considered as an element in fixing its value, the value of the use cannot alone be taken as a standard upon which to estimate and fix its market value. We can find nothing in the evidence cited by appellants which would justify us in setting aside the conclusion of the trial judge that no loss was occasioned by the sale of the property in question for $40,000 in lawful money of the United States.

While appellants have not specified any error committed by the trial court in refusing to surcharge the accounts of the executor with alleged losses from sales of property in Mexicali and in Algodones, they devote many pages of their briefs to a discussion of these two questions. What we have said concerning the alleged loss through the sales of the Tia Juana property applies to the sales of property in Mexicali and Algodones.

Appellants next complain of the loss of $500 per month in a renewal lease for rentals of Mexicali and Tia Juana properties to the Compania Commercial. The record discloses that Barreiro during his lifetime had leased these properties to this corporation which was owned and controlled by his friend Miguel Gonzales. The lease contained an option for a renewal over a period of years. It seems that the original lease contained a provision requiring that notice of an intention to exercise this option be given Barreiro at a Mexicali address. The notice was not sent to the Mexicali address but was given to and personally received by Barreiro in San Diego and also in Tia Juana. Upon this technicality of the notice not having been given at the Mexicali address, Barreiro, shortly before his death, started suit in the Mexican courts to cancel the lease and recover possession of the property. This suit was pending at the

time of his death. Subsequently a higher rental was offered by another party but was rejected by the executor. A renewal lease was executed to Gonzales at the rental specified in the original lease. Appellants maintain that loss to the estate was occasioned by not accepting the higher rental offered by the prospective new tenant. They particularly refer to a conference held in San Diego between Mr. Morison, representing the executor, Gonzales, various attorneys, and others, during which Gonzales offered to cancel his lease and surrender the property to the possession of the executor. We have carefully examined this portion of the transcript and find that Gonzales did make a statement in one portion of his testimony that he would cancel his lease, but all the evidence bearing on this subject would lead to the conclusion that this statement was not an offer of a present cancellation and surrender of the leased premises but a request that the executor examine the legal rights of the parties under the original lease and option for extension, together with the notices of intention to exercise this option actually given to Mr. Barreiro, and, if after such investigation it was of the opinion that the suits against the Compania Commercial could be prosecuted to a successful termination he would peacefully and without further litigation cancel his lease and surrender the property to the executor. We are of the opinion that the investigation made by the executor and its attorneys correctly disclosed that the action instituted by Barreiro could not have been brought to a successful conclusion. The new lease was for the same term and at a similar rental as specified in the option for an extension executed by Mr. Barreiro. Under this state of facts no loss was shown.

Appellants complain of an alleged loss of rental of $50 per month on a storeroom occupied by Eustaquio Valle. It is not questioned that this storeroom had a rental value of the amount stated. Valle had been employed by the executor to take care of certain business connected with the Mexican properties and was paid a monthly salary and as part of his compensation was furnished this room for use as an office. While the total compensation, including the use of the office, was somewhat in excess of that paid for like service in California, we have been referred to no evidence that would indicate that the total amount paid Valle

was an unreasonable amount for such services in Baja California. There being no evidence to the contrary, we cannot disturb the finding of the trial court that the amount paid to Valle by the executor, including the free rental of the room in question, was a reasonable amount to be paid for his services, and that the estate suffered no loss thereby.

Appellants make objection to the payment of the Belindez claim which had been allowed and which consisted of $750 and $2,855.75, paid on October 17, 1927, and December 21, 1927, respectively. They contend that the state succession taxes and the federal estate and income taxes ought to have been paid first because they bear a higher rate of interest than ordinary allowed claims and thereby a loss of interest resulted to the estate. Section 1643 of the Code of Civil Procedure classifies obligations with reference to priority. Debts given priority under the laws of the United States are assigned to the third class while liens generally are assigned to the fourth class and general obligations of the estate to the fifth class. The Belindez claim was a recognized debt of the estate and no objection can be made to its payment except, perhaps, as to time. From the opinion of the Honorable Charles C. Haines, trial judge, we quote and adopt the following: "In my judgment there can be no question about the propriety of paying it (the Belindez claim) prior to the payment of either the state succession tax or the federal estate tax. The state succession tax is a tax on the individual shares passing from the decedent by will or otherwise to other persons, and though the executor is liable for it, it is paid out of their shares, not out of the gross estate, and obviously cannot be intended to have any priority over the claims of any creditors of the decedent. The federal estate tax is reckoned on the value of the estate rather than any shares in the estate, but it is reckoned on the net estate, and obviously was not intended to prejudice creditors. The situation as to the federal income tax is, indeed, different, as that was a debt or obligation of the decedent incurred in his lifetime and which undoubtedly has a priority under the laws of the United States. There was, however, prolonged uncertainty about what it amounted to, and it is not clear from the evidence just when its amount was finally arrived at and fixed and placed in shape to be paid. In the meanwhile the Belindez claim bore seven per

cent interest. Were it clear from the evidence that the income tax demands were liquidated and fixed before the payments complained of on the Belindez claim were made, so that the executor deliberately preferred in time of payment a claim of the fifth class, bearing seven per cent interest, over one of the third class, having priority by law and bearing twelve per cent interest, doubtless it would be accountable for the five per cent difference in interest so lost. But in the circumstances it is not sufficiently plain that the executor did not use reasonable business judgment in that matter to make me feel justified in surcharging it on that account. As far as the principle of both obligations is concerned it would have to be paid in any event before the net share of the minors in the estate could be freed of the claim.''

■ Appellants' twelfth assignment of error refers to an alleged misconduct of the executor in entering into a contract with Mrs. Barreiro and in attempting to get her to execute a trust agreement placing her portion of the estate properties in trust with the executor for her use during her lifetime and for the benefit of appellants after her death. This contract was prepared before the appointment of the executor. The declaration of trust was not executed by Mrs. Barreiro. If executed it might have resulted in benefit to the appellants as it would have given them a fixed and present interest in the property of their mother which they do not now have. Neither the estate nor appellants were prejudiced by this contract or by the unexecuted declaration of trust.

■ In the opinion this day filed in case Civil No. 488 (*Estate of Barreiro*,■ *supra*) we have affirmed the order of the trial court directing the executor to pay the sum of $4,782.95 out of its own funds into the treasury of the Compania on the ground that it was negligent in not collecting this sum from Manuel Lujan, the Mexican attorney who disappeared before making payment of this money to the executor of the Compania. In that case we held that the probate court could examine the conduct of the executor in its control of the Mexican property of the deceased and the Compania because it had disregarded its corporate entity and managed the property in Mexico without due regard to

the existence of the corporation. In the instant case we have examined in great detail some of the actions of the executor in its management of the Mexican property and sustain the ruling of the probate court in refusing its removal, even though, through its negligence, it lost the money taken by Lujan. A return of this money by the executor will prevent its loss to the estate. The trial court was of the opinion that the executor and its then attorney, now deceased, were honestly mistaken in the position taken in the earlier years of the administration and that a refund of the money lost was all that the equities of the situation required, the removal of the executor not being necessary under the circumstances disclosed by the record. We have not disturbed these findings. Rulings were reserved on a number of questions involving possible loss to the estate. Because such rulings were reserved for future hearing and determination, these questions are not before us on either appeal except as to the right of the trial court to reserve its ruling.

As we have repeatedly stated, the property owned by Mrs. Barreiro should be removed from the possession of the executor. The income from this property, if any, does not belong to the estate. The expense of caring for and maintaining her portion should not be charged to the estate. It is evident that an accounting must be had and some adjustment made. Whether this will result in the executor being charged with a greater amount than its account now shows, or being credited with expenditures in excess of those now claimed by it, cannot now be determined. The order of the trial court should be amended by reserving to it the right to credit to, or charge against, the executor any sums that an accounting between it and Mrs. Barreiro may show necessary and proper under the circumstances of such an accounting.

It is ordered that there be, and there is hereby added to the order of the trial court filed on June 27, 1930, a paragraph numbered eighteenth, in words and figures as follows:

"Eighteenth: It is further ordered that the court reserve unto itself the right to further correct and modify the accounts of the executor by reducing from the total value of the property in the accounts charged to it, the value of that portion of such property as may be determined to belong

to Gertrudis Marquez Barreiro, if any, and to modify the accounts of the executor by adding thereto, or deducting therefrom, as the case may be, any income received by said executor on the property held by it during the course of administration which actually belonged to Gertrudis Marquez Barreiro, and any expense incurred by it which should have been properly charged against or credited to the said Gertrudis Marquez Barreiro, if it should finally appear that such credits or charges should be made."

The orders appealed from, as so modified, are affirmed.

Barnard, P. J., and Scovel, J., *pro tem.*, concurred.