[Civ. No. 10913.   Second Appellate District, Division One.—November 7, 1936.]

JOSEPH MILES, Respondent, v. BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION (a Banking Corporation), et al., Appellants.

Louis Ferrari, Edmund Nelson, Freston & Files, Ralph E. Lewis and John P. McGinley for Appellants.

Irl D. Brett for Respondent.

WHITE, J., *pro tem.*—This is an appeal from an order granting a new trial after a judgment of nonsuit. The action is one for damages for breach of contract. The contract relied upon consisted of a verbal promise made by the vendor of certain bonds that such bonds would be repurchased from the vendee at the original purchase price on demand of the buyer. Three bonds out of a total of eight were in fact repurchased, but the remaining five bonds, of the nominal or par value of $1,000 each, were not repurchased, on demand

or at all. At the close of plaintiff's case defendants moved for a nonsuit. This motion for nonsuit was based upon several grounds, among which it was urged that the evidence did not show any relationship between the defendant Bank of America National Trust and Savings Association and Bankamerica Company and America Investment Company, the actual vendor of the bonds, which could impose liability on the two first-mentioned defendants on any theory. It was further contended that plaintiff's claim in any event was barred by the statute of limitations (sec. 339, subd. 1, Code Civ. Proc.). After argument on and submission of the motion for nonsuit, the court granted the same. Judgment was accordingly entered in favor of defendants. A motion for a new trial was made, based on the following grounds:

"1. Insufficiency of the evidence to justify the granting of said motion for a non-suit and the rendering of a judgment of non-suit, and that the granting of said motion of non-suit and the rendering of said judgment thereon is against law.

"2. Errors in law, occurring at the trial and excepted to by plaintiff.

"Said motion will be based upon the minutes of the court, the court reporter's stenographic report of said proceedings at said trial, and upon all of the papers, records and files in said action."

The court then made the following order granting the motion for a new trial: "After consideration of the record, my notes of the testimony in this case, and argument, it seems to me now that from the evidence, a *prima facie* case of 'equitable estoppel' was established by plaintiff as against the non-suit granted on the ground that the Statute of Limitations had run, and for that reason plaintiff's motion for a new trial is hereby granted."

Respondent contends that on appeal this court is restricted to consideration only of the single ground stated by the trial court in its order as the reason for granting a new trial, and that if the trial court was correct in granting a new trial upon that single ground, this court is foreclosed from considering the question of whether or not the nonsuit was properly granted on one or more of the other grounds urged by appellants in their motion for such nonsuit. With this claim of respondent in the instant case we are not in

accord. Upon appeal from an order granting or denying a new trial, we are allowed to investigate the matters considered by the court upon such motion for a new trial. (*Marsteller* v. *Leavitt,* 130 Cal. 149, 151 [62 Pac. 384].) The record before us includes the reporter's transcript, containing all the evidence at the trial, including all grounds urged by appellants in presenting their motion for a nonsuit. While it is true the trial court specified in its order granting a new trial the single reason that ''a *prima facie* case of 'equitable estoppel' was established by plaintiff as against the nonsuit granted on the ground that the Statute of Limitations had run'', still the reasons given by the court for its action are not always material. (*Power* v. *Fairbanks,* 146 Cal. 611, 615 [80 Pac. 1075].) The reason given for the decision may be good and the decision at the same time incorrect for other reasons. It is the action of the court, and not the reasons given therefor, with which we are concerned. Every presumption, it is true, is in favor of the order made, and it devolves upon the party appealing from an order granting a new trial to affirmatively show error. This, however, may be done by presenting a record showing what was before the court upon the hearing of the motion. The record before us indicates that the motion for a new trial squarely presented to the trial court the question as to whether or not the granting of the motion for a nonsuit was justified by the evidence or was against law. The order simply indicates the action of the court, and not the showing upon which such action is based. Therefore, statements or recitals in the order as to the showing made constitute no part of the order. These things can be shown only by the record on appeal, in the preparation of which the party in whose favor the order is made has an opportunity, by the presentation of proposed amendments, to make the record speak the truth. Neither party can be deprived by recitals in the order of what the record on appeal shows. The record before us in the instant case presents for determination the question as to whether the evidence justified the trial court in granting the motion for a nonsuit, whether the granting of the same was against law, and whether there were errors of law occurring at the trial and excepted to by respondent. All these issues were tendered to and were before the trial court on the hearing of the motion for a new trial.

Before proceeding to a discussion of the grounds upon which this appeal is predicated, we deem it appropriate to epitomize the evidence in the case.

Respondent Joseph Miles, it appears, came to Los Angeles some time in 1928. Shortly after his arrival respondent went to the Bank of America and introduced himself to an officer of said bank, telling the latter that respondent had some money maturing in the middle west which he wanted to transfer to the local bank and deposit in a savings account. This being arranged, respondent some months later called at the bank to obtain the interest earned on his savings account. Respondent testified that on this occasion he again encountered an officer of the bank, to whom he said, "My money is maturing here and I have some interest due me." Whereupon the bank official said, "Well, you can't afford to keep your money in this savings, that amount of money. I will get you in touch with a representative of the bond department." According to respondent, the bank's officer introduced him to Mr. A. E. Nichols, as sales manager of the bond department, saying, "This man has a certain amount of money here and you take care of him, give him some sort of very good bonds that is all right." Respondent purchased eight one-thousand-dollar bonds of Marblehead Land Company. Subsequently, respondent was invited to contact the bank with reference to these bonds, which he did, and after a conversation with Mr. Nichols respondent exchanged the Marblehead Land Company bonds for bonds of Pacific Coast Aggregates. On this occasion, respondent testified, Mr. Nichols said to him, "Any time you need money or any time you want to, just bring them in here to this bank and we will pay you the full amount that you paid for them, plus the interest, the full amount." About September, 1929, respondent decided to sell one of the bonds and returned to see Mr. Nichols, but the latter was out of the city, and respondent was directed to see a Mr. Smith at the Seventh and Figueroa Streets branch of Bank of America. Locating Smith occupying a desk at the Seventh and Figueroa Bank of America branch, respondent advised Smith of his desire to sell one of the bonds. Smith appeared reluctant to repurchase, but after respondent said to him, "When I bought the bonds they told me at the time they sold it to me that any time I need money, all I had to do, bring the bonds and

the bank will buy it back from you for the full amount I paid plus the interest," Smith replied, "Well, all right." Respondent further testified that on this occasion Mr. Smith wrote something on a slip of paper and told respondent to go to Bank of America at Seventh and Spring, where the bond would be cashed. Following these directions, respondent went to Seventh and Spring, to the same office where he had purchased the bonds from Mr. Nichols, and there obtained cash for the bond concerning which he had talked with Mr. Smith.

About August, 1930, according to respondent's testimony, he again approached Mr. Nichols in the same office where he had originally purchased his bonds, telling Mr. Nichols that he needed some money and wanted to sell all of the remaining bonds. Respondent testified that Mr. Nichols said, "I don't know that the bank could pay you the full amount, because bonds are going down". To which, respondent testified, he replied, "That ain't in accordance with the agreement that you—we had at the time you sold me these bonds; you told me any time you need money, why, you bring the bonds in and the bank will buy back from you for the full amount that you paid". According to respondent, Mr. Nichols replied, "Well, yes, that is right, but conditions are different now, and everything is changed." Respondent testified that after further conversation he finally said to Mr. Nichols, "Aren't you in charge of the bank now, in the bond department?" To which Nichols replied, "Yes, but I couldn't do the things like I used to; conditions are different, things are changed . . . but the bank will carry out the promise just like I told you at the time you bought them." After further conversation along these lines, during which according to respondent, Mr. Nichols assured the former that the bonds were "gilt-edged", and urged him not to dispose of them, respondent was persuaded not to cash them, and he went away. Again a few months later, according to respondent's testimony, he contacted Mr. Nichols in an effort to dispose of the remaining bonds, but was unsuccessful in doing so. Along about September, 1931, respondent testified, he went to Mr. Nichols' office again, but was unable to locate the latter. Respondent thereupon went downstairs into the Bank of America, and making known the purpose of his mission to a man sitting at a desk marked "Vice-President",

was directed to go back to the office upstairs and see a Mr. Lemon. Talking with Mr. Lemon, respondent testified, he advised the former of what he claimed to be the agreement to repurchase made at the time he secured the bonds and stated he desired to dispose of them, as he needed money. According to respondent, Mr. Lemon stated, "Yes, Mr. Miles, I heard of the deal, I am familiar with the deal. It is a ruthless deal ever was known, to take a man like you and load him with them kind of bonds, but I am in charge of this Bank of America bond department, I am going to San Francisco, in a few days . . . I will then take this matter up with the head office in San Francisco." A few days later, according to respondent, word was left at his home for him to call at the bank, at which time, according to respondent, Mr. Lemon stated to him, "Well, I just got back from San Francisco. All we can do is cash you one bond at a time. I worked very hard with—when I was there, with the main office at San Francisco. I told them that you were here several times, you wanted to cash these bonds and that they didn't live up to their agreement as they promised you at the time they sold you the bonds, . . . All we could cash for you now is just one bond and just be patient, and they will carry out the terms just like they told you, . . . and whatever you do, don't start anything, don't go to any attorneys, lay low, and they will do just like they promised." On this occasion, according to respondent, he was paid the full value of one bond plus the amount of interest due up to that date. Thereafter, according to respondent, he continually contacted Mr. Lemon from time to time and was advised to be patient and not start anything, to "just lay low, don't rock the boat or go to any attorneys or anything like that, and the thing will be all right." These visits by respondent to Mr. Lemon, according to the former, continued up to approximately March of 1932, when, according to respondent he was advised by Mr. Lemon that no more bonds would be cashed for him. Respondent further testified that during his conversations with Mr. Lemon the latter told him that Mr. Giannini was "the head man, or something like that", whereupon respondent decided to write to Mr. Giannini and prepared a letter which was signed by the wife of respondent. The record contains, as plaintiff's exhibit 1, a letter under date of May 28, 1932, on stationery of "Bank

of America National Trust and Savings Association, A. P. Giannini, Chairman of the Board of Directors'', and addressed to respondent's wife, in acknowledgment of her letter concerning the bonds here in question. This communication, signed "A. P. Giannini, Chairman", reads in part as follows:

"In referring to our records, we find that the America Investment Company, from whom the bonds were originally purchased, repurchased $1,000 par value at 99 on September 23, 1929. Subsequently, Bankamerica Company, successors to America Investment Company and National Bankitaly Company, repurchased $1,000 par value at 99 on September 1, 1931, and $1,000 par value at 99 on October 15, 1931. When the last two purchases were made at 99, the market on the bonds was 30 and 25 bid, respectively. You can therefore see, Mrs. Miles, that in repurchasing the above bonds, Bankamerica Company absorbed quite a loss in paying you your purchase price of 99."

After discussing then existing economic conditions and their effect on the market, the letter concludes: "We shall be pleased to keep your account before us and endeavor, when the opportunity presents itself, to work out some trade which will enable you to recover some of your loss."

Again, under date of June 18, 1932, Mr. Giannini wrote respondent's wife in part as follows: "Viewing your case from every angle we must reiterate that there are thousands of instances where investors have lost practically all their money due to unforeseen causes and have not received any reimbursement such as you have. We believe that we have done our part, inasmuch as we have sustained considerable loss in the purchase of the last 2,000 par value Pacific Coast Aggregate 6½% Bonds from Mr. Miles."

Under date of December 2, 1932, W. F. McGrath, vice-president of Bankamerica Company at San Francisco, wrote respondent's wife in part as follows: "As Mr. Giannini informed you in his letter dated June 18, 1932, we cannot be held responsible for investors who purchased securities through any of our affiliated companies, where the market on the bonds has depreciated to a point where they incur a loss."

Respondent brought the action here in question on November 4, 1933, and at the time of the trial testified that the

bonds were then in his possession, unencumbered, and that he was able and willing to deliver the remaining bonds to appellants.

Appellants first urge a reversal of the order on the ground that the action was clearly barred by the statute of limitations. Section 339 of the Code of Civil Procedure bars an action upon a contract not founded upon an instrument in writing in two years. Appellants contend there was a demand made to repurchase and a refusal so to do in August, 1930, and again in September, 1931. The facts of the instant case, however, impress us that the statute did not commence to run until March, 1932, when repurchase of the bonds was demanded and for the first time unequivocally refused. As to appellants' contention that the demand to repurchase was not made within a reasonable time, it is sufficient to say that the question of what was a reasonable time for making a demand must depend upon the facts of each case and is primarily a question to be decided by the trial court. (*Kaplan* v. *Reid Bros., Inc.*, 104 Cal. App. 268, 272 [285 Pac. 868]; *Johnston* v. *Keefer*, 48 Idaho, 42, 46, 47, [280 Pac. 324, 325].)

Even though it be conceded that the statute of limitations commenced to run as contended for by appellants, we are nevertheless of the opinion that appellants were estopped by reason of their conduct toward respondent from taking advantage of the statute. As was said in *Calistoga Nat. Bank* v. *Calistoga Vineyard*, 7 Cal. App. (2d) 65, 72 [46 Pac. (2d) 246] : " . . . it is a well-established rule of law that when the act or promise of one person causes another in reliance thereon to do or forbear from doing a thing to his detriment, which he would have otherwise performed, the promisor is estopped from taking advantage of the act or omission of the promisee. The violation of such a promise amounts to fraud and estops the promisor from repudiating the agreement on the doctrine of equitable estoppel." In view of the foregoing evidence which we have set forth herein, we are of the opinion that appellants are estopped to set up the bar of the statute. Respondent was repeatedly assured that if he would be patient and wait, the bank would carry out its agreement. He was urged not to "start anything by going to any attorneys"; to "lay low and they would do just like they promised". Acceptance by appel-

lants of the favor so solicited from respondent involved as a matter of fair dealing an implied undertaking on appellants' part not to rely upon a defense based upon facts coming into existence solely from the granting of that favor by the plaintiff and his forbearance from bringing the suit within the statutory period. In 37 Corpus Juris, pages 725 and 726, it is said:

"The prevailing rule is that the doctrine of equitable estoppel may in a proper case be invoked to prevent defendant from relying upon the statute of limitations, it being laid down as a general principle that, when a defendant electing to set up the statute of limitations has previously by deception or any violation of duty toward plaintiff, caused him to subject his claim to the statutory bar, he must be charged with having wrongfully obtained an advantage which the court will not allow him to hold. Thus defendant will be estopped to set up the statute of limitations in bar of plaintiff's claim when the delay which would otherwise give operation to the statute has been induced by . . . *inducing plaintiff to believe that an amicable adjustment of the claim will be made without suit,* or by other forbearance to sue induced by defendant, or by defendant's husband as her agent." (Italics ours.)

In the instant case it appears to us that the delay about which the appellants now complain was induced by their own representations that they would make a voluntary adjustment with plaintiff. Where the delay in commencing action is induced by the conduct of the offending party it cannot be availed of by him as a defense. (*Mitchell* v. *J. H. Roth & Co.,* 124 Cal. App. 96, 99 [12 Pac. (2d) 91].) ▮ Nor is it necessary that the promisor shall sign a written agreement to waive the statute of limitations to bar him from subsequently repudiating his agreement. (*Calistoga Nat. Bank* v. *Calistoga Vineyard, supra.*) The authorities are uniform to the effect that the conduct of a promisor, or even his silence under certain circumstances, may result in an equitable estoppel. (Sec. 1962, subd. 3, Code Civ. Proc.; *Verdugo Cañon Water Co.* v. *Verdugo,* 152 Cal. 655 [93 Pac. 1021].) In the last-cited case it is said (p. 683) : "An estoppel may arise although there was no designed fraud on the part of the person sought to be estopped. . . . An estoppel may arise also from silence, as well as words." To create an equitable

estoppel "it is enough if the party has been induced to refrain from using such means or taking such action as lay in his power, by which he might have retrieved his position and saved himself from loss". (2 Pomeroy's Equity Jurisprudence, 4th ed., sec. 812, p. 1671.)

The trial court therefore was correct in its conclusion on hearing the motion for a new trial that under the evidence in this case an equitable estoppel had arisen.

■ Appellants' claim that they are not responsible for the promise to repurchase on any theory, whether of assumption of obligation by reason of corporate succession or upon the claim of the existence of an agency, actual or ostensible, is without merit. It would unduly prolong this opinion to here restate that portion of the evidence showing appellants' responsibility. Suffice it to say, we have read the record and find therein ample evidence showing there was a consolidation of Bank of America with Commercial Bank as America Commercial Corporation, a holding company; that Bank of America was ultimately consolidated with Bank of Italy and operated as Bank of Italy; that thereafter Bank of Italy, a state bank, obtained a national charter, taking the name of Bank of Italy National Trust and Savings Association, which was subsequently changed to Bank of America National Trust and Savings Association, one of appellants herein. The evidence further shows that at the time the promise was made to respondent to repurchase his bonds Bank of America had an investment agency known as America Investment Company, which was owned by the stockholders of Bank of America of California, and that Bankamerica Company, an appellant herein, was owned by the shareholders of Bank of America National Trust and Savings Association. In addition to the foregoing, we have the documentary evidence hereinabove set forth, tending very strongly, in our opinion, to establish a sufficient succession of interest by appellants herein to impress upon them responsibility to respondent. There is also abundant evidence, some of which we have herein outlined, to support both the actual and ostensible authority of Mr. Nichols to make the agreement with respondent, both on behalf of America Investment Company and appellant bank.

■ Appellants urge a reversal upon the ground that no liability could be imposed upon the appellant Bank of Amer-

ica National Trust and Savings Association in any event upon any theory of agency, express or ostensible, for the reason that the promise made to respondent was a promise to repurchase certain bonds at the price originally paid plus accrued interest. This claim is based upon the fact that section 5136 of the Revised Statutes of the United States prohibits a national bank from making such a repurchase agreement. We think the evidence in this case establishes the fact that at the time the contract here in question was made with respect to repurchasing the Pacific Coast Aggregate bonds, the America Investment Company was an affiliate and agent, so far as respondent was concerned, of Bank of America, which was a state bank and not operating under a national bank charter. Under such circumstances, we are of the opinion that the change of the state bank, which had full authority to make the agreement with respondent, into a national bank did not relieve the new national bank so created from its former liability as a state bank. Under the banking laws of the United States, the changing of a state bank into a national banking association does not destroy the identity of the original bank. All the assets and rights of the state bank pass to the national bank without any formal assignment and *are subject to all the existing liabilities and obligations of the state bank as if the change had not taken place.* (*Michigan Ins. Bank* v. *Eldred,* 143 U. S. 293 [12 Sup. Ct. 450, 36 L. Ed. 162] ; *Metropolitan Nat. Bank* v. *Claggett,* 141 U. S. 520, 527 [12 Sup. Ct. 60, 35 L. Ed. 841] ; *Estate of Barreiro,* 125 Cal. App. 153, 172 [13 Pac. (2d) 1017] ; *Bank of America* v. *Granger,* 115 Cal. App. 210, 218 [1 Pac. (2d) 479] ; *Kelsey* v. *National Bank,* 69 Pa. 426, 431.) Where a state bank reorganizes into a national bank it passes from one jurisdiction to another, but its identity is not thereby necessarily destroyed. It remains substantially the same institution under another name and subject to new control. (*Coffey* v. *National Bank,* 46 Mo. 140 [2 Am. Rep. 488] ; *City Nat. Bank* v. *Phelps,* 86 N. Y. 484.) With these rules before us, the conclusion is inevitable that the transition of Bank of America, a state institution, into a national bank carried with it responsibility for the obligations of the state bank and its· agents to respondent.

For the foregoing reasons, the order by which plaintiff's motion for a new trial was granted is affirmed.

York, Acting P. J., and Doran, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 7, 1936, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 4, 1937.